2011 WY 92

**Troy Dean WILLOUGHBY,
Appellant (Defendant),**

v.

**The STATE Of Wyoming,
Appellee (Plaintiff).**

No. S–10–0161.

Supreme Court of Wyoming.

June 8, 2011.

Representing Appellant: Diane M. Lozano, State Public Defender, and Tina N. Olson, Appellate Counsel, Wyoming Public Defender Program. Argument by Ms. Olson.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Senior Assistant Attorney General. Argument by Ms. Pojman.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Elizabeth Miles Ehlers (the victim) was shot to death in Sublette County, Wyoming, on June 21, 1984. Troy Dean Willoughby (the appellant) was convicted of that murder on January 29, 2010. The appellant now appeals that conviction and the denial without a hearing of his motion for a new trial. Finding no error, we affirm.

## ISSUES

[¶ 2]   1.   Did the district court abuse its discretion by failing to grant the appellant's motion for a new trial?

2.   Did the prosecutor commit misconduct by violating discovery orders, by violating a pre-trial order regarding uncharged misconduct evidence, and by eliciting testimony from a law enforcement officer that the officer believed a witness was lying during an interview?

## FACTS [1]

[¶ 3]   During the evening of June 20, 1984, the victim attended a party with friends in Jackson, Wyoming.   The appellant and his wife (R.H.) and a companion (T.B.) were also present.   At some point during the party, the appellant sold some "dope" to the victim, who said that she would go get the payment money from her car.   The appellant, watching from a window, saw the victim get in her car and drive away.   He hurried to follow her, and was joined by R.H. and T.B. as he left.   As they were leaving, the appellant saw R.C., the person from whom he had purchased the "dope," and to whom he still owed the purchase money, and the appellant commented to R.C., "I might need that piece."

[¶ 4]   Driving his car, with T.B. in the passenger's seat and R.H. in the back seat, the appellant chased after the victim.   At some point, as they headed south out of Jackson, the appellant pulled over to the side of the road, and R.C. pulled in behind the appellant's car.   The appellant went to R.C.'s vehicle and returned with a pistol.   He then resumed the chase of the victim, eventually coming upon her car pulled over in a turnout.   Upon seeing the vehicle, the appellant said something like, "I've been looking for her."   He pulled in behind the victim's car, got out of his car, approached the victim's car, and dragged her out by the hair.   A struggle and screaming match ensued, during which the appellant punched the victim twice in the face, causing her to fall to the ground.   The

appellant returned to his car, retrieved the pistol, walked back up to the victim and shot her twice.

[¶ 5]   When the appellant returned to his vehicle, R.H. demanded to know what he had just done.   The appellant responded that "this will teach the bitch to rip me off."   The appellant then drove to his home in Daniel, a small town south of Jackson, where R.H. drove him to work.   T.B., being too afraid to leave and having no transportation, stayed with the appellant and R.H. for a few days.   At some point, the appellant told R.H. he needed help hiding the gun, which was eventually hidden in the couple's septic tank.   When R.H. initially refused to assist the appellant, he struck her in the face with the butt of a rifle.   After witnessing that violence, T.B. hitchhiked back to Jackson, where he made an anonymous telephone call to law enforcement saying the appellant had killed the victim.

[¶ 6]   During the trial, several witnesses implicated the appellant in the victim's murder.   Much of the preceding factual scenario came from the testimony of R.H. and T.B., the eye witnesses, and from B.C., a fellow inmate with whom the appellant had discussed many aspects of the crime.   In addition, another witness, D.S., testified that, during a hunting trip in 1984, the appellant had described how the victim was murdered, and that the appellant's account scared D.S. to the point that he eventually reported it to authorities.   At the time of the murder, however, not everyone was so forthcoming, and insufficient evidence was developed with which to charge the appellant.

[¶ 7]   The appellant's trial defense was that of alibi.   He claimed to have been at work at the time of the murder.   The State presented expert testimony, however, indicating that the appellant's signature and initials on the "drilling log" had been forged.   Further, the appellant told B.C. that he had paid the driller $100.00 for the forgery.   Beyond that, the appellant's defense focused

---

1.   Given the lengthy period of time that passed between the murder and the trial, the many witnesses who testified did not always give consistent versions of the incident.   The "facts" that we will present here are compiled from the testi-

mony of several witnesses, and are presented in the light most favorable to the State, inasmuch as the jury, having convicted the appellant, obviously accepted some version of the facts as presented by the State.

upon inconsistencies in the details of the testimony of the State's witnesses. The jury found the defendant guilty of first-degree murder, and the appellant's post-trial motion for a new trial was deemed denied when it was not determined by the district court within the time constraints of W.R.Cr.P. 33.

## DISCUSSION

### *Did the district court abuse its discretion by failing to grant the appellant's motion for a new trial?*

[¶ 8] We review the denial of a motion for new trial, including a motion based upon alleged prosecutorial misconduct, for an abuse of discretion. *Lawson v. State,* 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010); *Schafer v. State,* 2008 WY 149, ¶ 21, 197 P.3d 1247, 1251 (Wyo.2008). Similarly, the decision whether or not to grant a hearing upon the filing of a motion for new trial is within the sound discretion of the district court; the district court "may deny a motion for new trial without a hearing when all that is necessary for disposition is already in the record." *Best v. State,* 769 P.2d 385, 389 (Wyo.1989). An abuse of discretion occurs when the district court could not reasonably have concluded as it did. *Schafer,* 2008 WY 149, ¶ 21, 197 P.3d at 1252.

### *Statement by the Appellant to D.S.*

[¶ 9] In his new trial motion filed on February 3, 2010, the appellant raised eight issues. The first issue was whether the State had violated two court orders—one regarding uncharged misconduct evidence and one requiring the State to set forth the proposed testimony of witnesses—by eliciting testimony from D.S. that had not been revealed to defense counsel. The essence of that testimony was that, sometime after D.S. had told the authorities about the appellant's

hunting camp description of the murder, D.S. and the appellant saw one another at a gas station and the appellant threatened to kill D.S. if he ever again talked to the police.

[¶ 10] Defense counsel objected at trial to this testimony as being violative of W.R.Cr.P. 16(a)(1)(A)(i)(2), because the State had not disclosed the alleged threat.[2] After a hearing outside the presence of the jury, the district court admonished the prosecutor for not disclosing the statement, and then instructed the jury to disregard that portion of D.S.'s testimony. The State now contends that W.R.Cr.P. 16(a)(1)(A)(i)(2) governs only oral statements made to law enforcement officers, and that the summary of D.S.'s testimony disclosed in discovery was adequate under the rule.[3]

[¶ 11] We have said many times that a trial error may be corrected by an appropriate curative instruction, and that we presume that jurors follow the court's instructions. *See, e.g., Janpol v. State,* 2008 WY 21, ¶ 24, 178 P.3d 396, 405 (Wyo.2008); *Brown v. State,* 953 P.2d 1170, 1177 (Wyo. 1998); *Rubio v. State,* 939 P.2d 238, 243 (Wyo.1997); and *Burke v. State,* 746 P.2d 852, 857 (Wyo.1987). In the instant case, the district court instructed the jury as follows immediately after the appellant's objection:

THE COURT: All right. You may all be seated. The jury is present again.

And I want to remind the jury of initial instruction that I gave to them about when evidence is stricken. I instructed you [sic] the outset that sometimes throughout the trial I would be called upon to pass upon the question of whether or not some evidence might be admitted and that you weren't to be concerned with my reasons for such rulings. And if I do strike evidence you are number one not to consider

---

**2.** W.R.Cr.P. 16(a)(1)(A)(i)(2) provides as follows:
    (a) *Disclosure of evidence by state.—*
    (1) Information Subject to Disclosure.
    (A) Statement of Defendant.
    (i) Upon written demand of a defendant the state shall permit the defendant to inspect and copy or photograph:
    . . . .
    (2) The substance of any oral statement which the state intends to offer in evidence

at the trial made by the defendant whether before or after arrest[.]

**3.** As to the first proposition, the State relies upon *Ceja v. State,* 2009 WY 71, ¶¶ 13–16, 208 P.3d 66, 68–69 (Wyo.2009). Because we resolve this issue on other grounds, we take no position here on whether *Ceja* stands for the proposition that the Rule is limited to oral statements made to law enforcement officers.

it and certainly not to consider the reasons for me striking it because you certainly are the triers of the facts, but I am the—the Court determines the admissibility of evidence.

So I am hereby instructing you, ladies and gentlemen of the jury, that you are not to consider any of [D.S.]'s testimony considering the—when he saw the Defendant at the Chevron station, any statements made by the—allegedly made by the Defendant, you are not to consider any of those or [D.S.]'s move to California.

In other words, [D.S.]'s testimony of anything after he said he talked to the Sheriff, anything after that is stricken and you're not to consider anything after that.

[¶ 12] A new trial should be granted only "if required in the interest of justice[,]" which standard is similar to that for granting a mistrial: "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of *an error so prejudicial that justice could not be served by proceeding with trial.*" *Yellowbear v. State,* 2008 WY 4, ¶ 67, 174 P.3d 1270, 1295 (Wyo.2008) (quoting *Warner v. State,* 897 P.2d 472, 474 (Wyo.1995) (emphasis added)). The appellant bears the burden of proving prejudice by the denial of a new trial motion. *Yellowbear,* 2008 WY 4, ¶ 67, 174 P.3d at 1295. Here, in the context of the overwhelming evidence of the appellant's guilt, and the district court's detailed curative instruction, we cannot say that the post-trial motion should have been granted. The appellant has not met his burden of showing that he was prejudiced by denial of the new trial motion in respect to the stricken testimony.

***Testimony of Gene Ferrin.***

[¶ 13] At the time of the murder, Gene Ferrin was an investigator for the Teton County Sheriff's Office. During the trial, Ferrin testified that he responded to a call to the murder scene in Sublette County, not as an investigator, but as an ambulance attendant. Several days later, however, he learned of an anonymous "Crime Stoppers" call that had come into the Teton County Sheriff's Office, identifying the appellant as the murderer. Ferrin forwarded that information on to the Wyoming Division of Criminal investigation, the agency in charge of the murder investigation.

[¶ 14] Some months later, Ferrin happened to be interviewing T.B. during the investigation of an unrelated crime. Knowing T.B. to be an associate of the appellant, Ferrin asked T.B. if he had made the anonymous telephone call. At trial, Ferrin testified that T.B. responded with "that deer in the headlight look[ ]," turned very white, and refused to talk about the call. Defense counsel did not object to this line of questioning. After several other witnesses had testified, however, and the court was about to recess for the day, defense counsel made the following comments during a generalized complaint about the prosecutor's conduct throughout the trial:

Furthermore, Officer Ferrin, we had nothing in discovery about that telephone call, nothing whatsoever. There was no indication on the witness list of what he was testifying that he would be testifying to that. It was a major part of this trial. I don't know if I would call it a direct violation of discovery rules, it certainly violates the spirit of this. We're not doing trial by ambush.

[¶ 15] Neither party has suggested that the absence of a contemporaneous objection takes this inquiry outside the abuse of discretion standard, presumably because the question is presented as part of the appeal of the denial of the new trial motion. With that in mind, we conclude that the district court did not abuse its discretion in denying the motion based upon this issue. Even if defense counsel was unaware before trial that Ferrin had asked T.B. about the telephone call, we cannot conclude that such affected the outcome of the trial. Information relating to the Crime Stoppers call was contained in another officer's report, which report was received by defense counsel and was used to cross-examine T.B. In his opening statement, defense counsel noted that T.B. claimed to have made the anonymous call. Furthermore, defense counsel cross-examined the former Teton County Sheriff regarding the Sheriff's memory that his office received numerous anonymous calls about the murder,

but he did not recall one coming in only a few days after the murder. And finally, during the cross-examination of Ferrin, defense counsel produced a transcript of a recorded 1985 anonymous telephone call received by the Teton County Sheriff's Office, apparently in an attempt to prove that, had the alleged T.B. call been made, it would have been recorded and a transcript would exist. Ferrin testified that some incoming lines were recorded, but the Crime Stoppers line was not. In short, defense counsel knew about the alleged anonymous telephone call, knew that it was allegedly placed by T.B., and knew that it implicated the appellant. In that context, the fact that defense counsel may not have known that Ferrin asked T.B. about the call did not affect the outcome of the case.

### Testimony of Mark Hollenbach

[¶ 16] Mark Hollenbach was employed by the Wyoming Division of Criminal Investigation from 1993 to 1999. One of his first assignments was to review the accumulated files in the Elizabeth Ehlers murder case. Soon after receiving the case files, Hollenbach traveled to Jackson for a group meeting of the various agencies involved in the investigation. At that meeting, Ferrin told Hollenbach about the anonymous telephone call discussed above, and told Hollenbach that he believed T.B. had made the call. Hollenbach testified at trial that, because of his full case load, and because this was merely an introductory meeting, he prepared no report about the meeting.

[¶ 17] The appellant makes the same appellate argument in regard to the testimony of Hollenbach that he made in regard to the testimony of Ferrin. That is, the appellant contends that, because Hollenbach provided no report of his having learned from Ferrin that Ferrin suspected T.B. of placing the anonymous telephone call, the appellant was unfairly surprised by such revelation at trial. Labeling this a significant breach of the prosecutor's duty to provide a summary of each witness's expected testimony, the appellant contends that the proper remedy is a new trial.

[¶ 18] T.B. told Hollenbach that he had placed the Crime Stoppers call. T.B. also testified at trial that he had done so. Part of the defense trial strategy was the suggestion that, through overbearing interrogation techniques, including the "feeding of details," Hollenbach had induced T.B. to tell a story that fit law enforcement's theory, rather than to tell the truth. This strategy, the appellant now argues, was undermined by the State's late revelation that T.B. was asked about the telephone call by Ferrin, and that Hollenbach knew, at the time he interviewed T.B., that Ferrin suspected T.B. of making the call. In other words, the appellant's allegation that Hollenbach had badgered T.B. into admitting that he made the call was somehow undermined by Ferrin having earlier asked T.B. about the call.

[¶ 19] Viewing all of this in the context of Hollenbach's testimony does not change our conclusion that it did not affect the outcome of the trial. If anything, it probably aided the defense because it allowed counsel not only to emphasize the differences in the various stories told by T.B. to investigators over the years, but it presented an opportunity for the defense to cast aspersions upon the techniques used by the law enforcement officers investigating the case. Beyond that, T.B. testified at the trial and admitted that he had made the call. The jury was able to judge his credibility against that of the officers. The district court did not abuse its discretion by failing to grant a new trial on the basis of this discovery issue. Even if the State breached a discovery order by failing to include in its witness summaries the fact that Ferrin asked T.B. if he had placed the call, such was not of a magnitude as to have thwarted the ends of justice.

### Testimony of Ruth Kohlmeier

[¶ 20] The pathologist who performed the autopsy on the victim in 1984 was physically unable to testify at trial. In his stead, the State called Dr. Ruth Kohlmeier, a forensic pathologist who had reviewed the original autopsy report and related materials. Although the State listed Kohlmeier as a witness in its first witness list, her report was not prepared or provided to defense

counsel until the month before trial. Prior to obtaining the report, the State did, however, file a response to the appellant's motion *in limine,* indicating that Kohlmeier would testify "to the autopsy, concurring with all of [the original pathologist's] findings except his observation of the mid-line nose and his omission of any mention of the bruise above the victim's eye." Eventually, Kohlmeier's report was provided to defense counsel on the date required by the district court. Shortly before trial, Kohlmeier filed an amended report in which she indicated that she had changed her mind as to certain conclusions in her first report. The primary change was that she now concluded that the gunshot wound to the victim's chest would have been fatal.

[¶ 21] Defense counsel interposed an objection during Kohlmeier's trial testimony, which objection was heard outside the jury's presence. In addition to the belated change to Kohlmeier's report, counsel complained that Kohlmeier's testimony as to the temporal order in which the wounds to the victim occurred went beyond Kohlmeier's expert designation. After hearing the objection, the district court allowed Kohlmeier to testify as to the order in which the wounds had been inflicted upon the victim.[4]

[¶ 22] On appeal, the appellant repeats his trial objections to Kohlmeier's testimony: (1) the relative lateness of the report and the amended report; (2) the report's contradiction of the original autopsy report; (3) Kohlmeier's testimony as to the order of the wounds, which defense counsel characterized as "crime scene reconstruction"; and (4) the testimony exceeded the scope of Kohlmeier's expert designation. The appellant contends that this was a prejudicial discovery violation that left him without notice of what Kohlmeier's testimony would be.

[¶ 23] Once again, we review this issue for abuse of discretion. Consequently, our task is to determine whether the district court reasonably could have admitted Kohlmeier's testimony, and reasonably could have determined not to grant the new trial motion as it related to that testimony. First, we

note that an Order Upon Status Conference filed on July 30, 2009, gave a date for the parties to submit witness lists, along with a summary of each witness's testimony, but allowed supplementation of such "if witnesses are discovered after this date." Second, Kohlmeier was listed as a may call witness in the State's pre-trial memorandum, filed two months before the trial, with the following designation as to her potential testimony:

> MAY testify to her professional qualifications as a forensic scientist, her forensic testing, respectively of the exhibits herein, the protocol and procedures used in conducting such testing, the results of the same, participation in the chain of custody of evidence in this case, as well as all other matters within her knowledge having relevance in this case.

[¶ 24] In response to another pre-trial defense motion, the State provided the following additional information about Kohlmeier's expected testimony:

> **2. Dr. Ruth Kohlmeier.** [W.F.] is the pathologist that performed the autopsy on the victim [ ] twenty five years ago. Because [W.F.] is alive, the State initially expected to call him to testify as to the forensic pathology of this case. The State then discovered that [W.F.] suffers from [d]ementia and has lost the ability to speak. The State immediately began its search for a forensic pathologist to examine [W.F.'s] findings and prepare to testify to the autopsy and forensic pathology, and ultimately enlisted Dr. Ruth Kohlmeier for this purpose. The State has advised the Defendant that we have not yet received a report from Dr. Kohlmeier and that a copy of that report would be forwarded to the Defendant as soon as we receive it. The state has contacted Dr. Kohlmeier and requested all speed in her submission of the report. The state has advised the Defendant that while we do not yet have the report, Dr. Kohlmeier has verbally indicated that she will be testifying to the autopsy, concurring with all of [W.F.'s] findings except his observation of the mid-line nose

---

4. The victim was shot twice—once in the chest, and once in the head, behind the right ear.

Kohlmeier testified that the gunshot wounds occurred in that order.

and his omission of any mention of the bruise above the victim's eye.

Finally, as mentioned above, Kohlmeier's consultation report was provided to defense counsel on the date required by the district court.

[¶ 25] Under the circumstances set forth above, we cannot conclude that the district court abused its discretion in allowing Kohlmeier to testify. The pathologist who performed the autopsy was unavailable, and the State detailed its reasonable efforts in obtaining replacement testimony. The record indicates that the State met the deadlines imposed by the district court in these discovery matters, including production of Kohlmeier's report on the date required. It appears from the record that only this original report, and not Kohlmeier's later amended report, was admitted into evidence. Even before Kohlmeier's report was available, the State informed the appellant that Kohlmeier would disagree with portions of the original autopsy report. While the summary of Kohlmeier's proposed testimony did not specify that she would testify as to the temporal order of the victim's wounds, the appellant has not provided the Court with any authority that a summary of testimony must contain details of that nature, and it certainly should come as no surprise that, where a victim has been shot more than once, the pathologist may testify as to the order in which the victim received her wounds.[5]

[¶ 26] The district court is obligated to pursue the matter when there has been an allegation of a discovery violation. *Seivewright v. State*, 7 P.3d 24, 27 (Wyo.2000). Further, if a violation is found to have occurred, the district court is obligated to exercise its discretion in determining the appropriate sanction. *State v. Naple*, 2006 WY 125, ¶ 24, 143 P.3d 358, 365 (Wyo.2006). Here, the district court made extensive inquiry into the discovery process as it related to Kohlmeier's report, amended report, and testimony. Eventually, while it did not grant

the appellant's motion to strike Kohlmeier's testimony, it did limit the State to asking one additional question after the objection was interposed—that question being whether the chest wound or the head wound was the last wound. The appellant has not shown that he was unfairly prejudiced by the district court's rulings.

### *Testimony of Sara Brew*

[¶ 27] In 2009, Sara Brew was a detective working in the Sublette County Sheriff's Office. She was one of the detectives assigned to the re-opened investigation into the victim's death. She testified at trial primarily about an interview of the appellant conducted by several law enforcement officers in Helena, Montana, in February 2009. The following statement from the appellant's new trial motion sums up his complaint with Brew's testimony:

5. **Sara Brew.** Detective Brew introduced the Defendant's 11 hour interview and then testified to several other matters concerning the investigation. A major part of the defense case was to show why [T.B.] and [R.S.] would implicate the Defendant in the victim's death. During one part of the cross-examination Ms. Brew steadfastly denied that neither [sic] of the witnesses just mentioned had been threatened with prosecution. Defense counsel then produced a transcript in which Ms. Brew testified under oath at a suppression hearing that [T.B.] was in fact threatened with prosecution. It is hard to fathom that an officer of the law would offer testimony totally inconsistent with earlier sworn testimony, but in this case, it was yet another example of the State attempting to elicit testimony regardless of the rules.

[¶ 28] The last sentence of this excerpt indicates that the appellant has two grievances in regard to Brew's testimony: (1) that an officer of the law lied; and (2) that the State elicited the lie. Those themes are repeated in the brief presented to this Court

---

5. Criminal discovery is a shield which serves to protect a defendant from surprise, and which gives him or her reasonable notice to allow preparation of a defense. Criminal discovery is not a sword to be wielded by a defendant in a game of "gotcha" when a witness testifies to something generally within his or her designation, but not specifically delineated. The latter may, however, be fruitful as a cross-examination tactic.

by the appellant, wherein he alleges that "Ms. Brew's, and the prosecution's lack of forthrightness in this matter materially prejudiced [the appellant's] defense, and denied him his right to a fair trial. The appellant then cites *Lawson v. State*, 2010 WY 145, ¶ 50, 242 P.3d 993, 1008 (Wyo.2010) for the proposition that not only must the State avoid the presentation of known false evidence, but it should also correct false evidence when it occurs, even if it did not elicit it.

[¶ 29] While we agree with the principle of law just stated, we do not see anything of this nature having occurred in regard to Brew's testimony in this case. In a suppression motion hearing on October 20, 2009, the following colloquy occurred during the cross-examination of Brew:

Q. Yeah. You agree that's what's happening in the interview with [the appellant]? That throughout the interview the law enforcement—I'm going to say you guys, law enforcement—is saying that we don't know why [R.H. and T.B.] would come in and say this, correct?

A. True.

Q. But that's not true, you know why [T.B.] would have a reason to come in and say that based on the immunity agreement, correct?

A. No, I wouldn't agree to that. I don't—the immunity, which I'm not even sure what that was even for, didn't have anything to do with him being in any trouble. He hadn't committed any crime at that point or that we knew about.

Q. Well, yes, he did, he was an accessory to the homicide and that's what he was threatened to be charged with if he didn't—

[PROSECUTOR]: Objection, Your Honor. Totally mischaracterizes all of the evidence that's been put before this Court and perhaps even the facts. I don't have any idea where she's getting to.

[DEFENSE COUNSEL]: I'll tell you.

THE COURT: Okay.

[DEFENSE COUNSEL]: Your Honor, what's happening here is that the police throughout this interview, when you watch this video for 11 hours, continue to tell [the appellant] you have two people, the two closest people to you, saying these things and we have no idea why they would say it.

And [the appellant] throughout this interview, and even until the 5th of March, keeps saying I don't know why they would say this. And they pat themselves on the back for showing him part of these interviews and saying we're being honest with you, but that's not true. They knew they had offered [T.B.] immunity and that could be a reason why he's lying and they don't share that with [the appellant].

So that's why those interviews are relevant because they knew when they were sitting in this interview with [the appellant] that they had offered him immunity and that goes to the coercion of [the appellant's] later statements.

[PROSECUTOR]: This must be coercion through osmosis, Your Honor, because unless they tell the Defendant about that there's no way that it can effect [sic] him.

THE COURT: I'm going to overrule and you may proceed, [Defense Counsel].

[DEFENSE COUNSEL]: Thank you, Your Honor.

Q. [ ]: So [T.B.] has reason—the immunity granted [T.B.] is immunity from prosecution for being accessory to murder, correct?

A. I believe so.

Q. Okay. So he was in jeopardy if he didn't get immunity, isn't that fair?

A. In jeopardy of what?

Q. Being prosecuted?

A. Okay, I guess, yeah.

Q. Okay. That's the whole point, that's the whole reason for an immunity letter, correct?

A. Yeah.

[¶ 30] During the direct examination of Brew at trial, the prosecutor asked no questions about the grant of immunity to T.B. or any threat to prosecute him. During cross-examination by defense counsel, however, those subjects were vigorously pursued:

Q. And during this interview it's fair to say that both [the appellant] and I'm going

to say you, you and Mr. Ketterhagen collectively, kept asking why would someone say that; isn't that right? [6]

A.  Correct.

Q.  But you never told him why [T.B.]—what [T.B.] said that 11/15 interview, did you?

A.  He did not—[the appellant] did no[t] view that interview, no.

Q.  Correct.  But you agree that when he's trying to figure out why [T.B.] said that you never told him that [T.B.] was threatened in that interview on 11/15, did you?

A.  Ma'am, that's not correct.

Q.  [T.B.] wasn't threatened in that interview?

A.  No.

Q.  He wasn't threatened to be charged as an accessory if he didn't cooperate?

A.  I don't believe so, ma'am.

Q.  He wasn't threatened with a life sentence?

A.  I don't recall that ma'am.  I don't believe he was threatened.

Q.  He wasn't threatened at all in that interview?

A.  I don't believe so, ma'am.

Q.  So you say you were present for that interview?

A.  We're talking about the one that took place on the 15th?

Q.  Correct, ma'am.

A.  That's correct.

. . . .

Q.  [ ]:  Now, Ms. Brew, when Mr. Ketterhagen says this piece of paper is going to save your butt, why would—if that's not a threat to [T.B.] why would his butt need to be saved?

A.  I think the point that Mr. Ketterhagen was trying to make with that was to say that although [T.B.] had witnessed a murder and was at the scene the fact that he failed to report it, I think that's the point

Mr. Ketterhagen was trying to make when making that statement.

Q.  Okay.  So charging someone with accessory before the fact to a first degree murder is not a threat.

A.  I believe he told him several times that he was not the target of any investigation, that he was free to go.

Q.  Well, let me ask you this:  Mr. Hanson says, "What I would be worried about if I was you is that if you don't come clean and tells [sic] us everything that happened and she puts you at the scene and you're still holding out that you don't know anything you could be charged with accessory before and after the fact." [7]  That's a threat, isn't it?

A.  Once again, I think the point they were trying to make was that although [T.B.] had witnessed the murder 24 years ago that it was okay, it was a safe environment for him to tell us what he saw.

Q.  What [sic] he told, "You have an opportunity to get out of this god damn mess."  That's not a threat either?

A.  I think what he meant by saying that statement was that all this stuff that [T.B.] had been dealing with for so many years, this was the time that he could get—move past it and not have to deal with it in his life anymore.

Q.  He said he was in a god damn mess if he doesn't speak, isn't that what Mr. Hanson told him?

A.  I didn't perceive it that way, ma'am.

Q.  Then this exchange:  "If we hear from the forensics where we sent the hair with the root on it and it comes back and we leave here with nothing and it comes back with your DNA on it—" and Mr. Hanson says "—or even [the appellant's] you put yourself with [the appellant] that night in your own statements we're going to have problems."  You don't think that's a threat either, do you?

A.  No, I don't.

6.  Captain Brian Ketterhagen supervised the investigation for the Sublette County Sheriff's Office at the time.

7.  Randall Hanson was employed at the time as the "investigator and trial facilitator" for the Sublette County Attorney's Office.

Q. "I don't want to see you go to jail, [T.B.]" Now he's being threatened with jail; isn't that right?

A. Can you read that statement again, I'm having difficulty with the video.

Q. It says, "And if it's not us then somebody else, you're going to get implicated and this is going to be taken away and you're not going to have that option, I don't want to see you go to jail."

A. Okay. What was the question?

Q. That's a threat, isn't it?

A. I don't perceive it to be a threat, no.

[¶ 31] This line of questions and answers goes on for several more pages in the trial transcript, but the above should be sufficient to show the appellant's position, which was that T.B. had implicated the appellant under threat of prosecution, but Brew denied that such a threat had occurred. During the State's re-direct examination of Brew, the prosecutor attempted to question her about this series of cross-examination questions and answers, and whether or not T.B. was threatened during the interview, but, perhaps ironically, he was unable to pursue the topic because the district court sustained defense counsel's objection on the ground that it was up to the jury, not the witness, to determine whether T.B. was threatened during the interview. To complete the irony, defense counsel then proceeded during re-cross examination to ask Brew several more questions about [T.B.] and threats of prosecution and the grant of immunity to him, and to impeach Brew with her testimony from the October 20, 2009, motion hearing set forth above.

[¶ 32] We will affirm, without much discussion, the denial of the new trial motion as it pertains to the issue of Brew's testimony about T.B. and threats and immunity. At the outset, we will note that there is not one iota of evidence that the prosecutor committed any act of misconduct in this regard. All of the challenged testimony was developed during cross-examination by defense counsel, and when the prosecutor attempted to clarify Brew's answers, he was cut off by a sustained objection. Beyond that, the questions and answers are little more than a verbal jousting match between counsel and witness

wherein counsel wants the witness to agree with counsel's interpretation of words used by other law enforcement officers during T.B.'s interview. The appellant certainly was not prejudiced by this vituperative exchange; instead, defense counsel was allowed repeatedly to bring to the jury's attention the appellant's theory that T.B. had lied to obtain immunity.

### Destruction of Evidence

[¶ 33] This allegation focuses upon the State's alleged failure to preserve two "sketches"—one apparently drawn during an interview of T.B., and one apparently drawn during an interview of R.H., both in 2008. Evidence of the former was elicited during the cross-examination of Detective Brew:

Q. And because the video—or it appears that nobody thought the video was on you do a little pre-sketch with [T.B.]; isn't that right?

A. No, ma'am. I knew the video was on.

Q. Well then why did you tell [T.B.] we're going to do a pre-sketch?

A. Ma'am, I did not say that.

Q. Well, you were present in the interview you heard that, right?

A. That statement that I just read, yes.

Q. Well, you heard that they were going to do a pre-sketch with [T.B.], right?

A. I didn't hear the word pre-sketch.

Q. Going to turn your attention to Page 30 Line Number 5. What did Mr. Hanson tell him?

A. He said, "Would you do a little sketch, a little pre-sketch?"

Q. Right. And actually [T.B.] attempts to draw a sketch of this, correct?

A. Yes, that's correct.

Q. But he gets the details wrong so you show him pictures, right?

A. I don't know if he had the details wrong at that point or not.

Q. Where's that sketch today?

A. I don't know.

Q. Did it get thrown away?

A. I don't recall. I don't know.

Q. Did you leave—you don't remember leaving the room with it or anything?

A. I didn't have it in my possession, no.

[¶ 34] Defense counsel did not further pursue the matter of the T.B. sketch during Brew's testimony, and did not ask T.B. about it when he testified. Counsel did, however, make the following comment during a later argument to the court about the R.H. sketch: "[T.B.] drew a sketch that they don't know where it is." And in closing argument, defense counsel argued that a pre-sketch was done to make sure T.B. did not "get[ ] it wrong" during the video-taped interview. In his appellate brief, the appellant does little more than mention the T.B. sketch.

[¶ 35] More detail was presented at trial concerning the sketch purportedly drawn during the R.H. interview. At a break in the trial after Dr. Kohlmeier's testimony, defense counsel placed various discovery grievances on the record. In regard to the R.H. sketch, counsel said the following:

> Then Sunday, Judge, this last Sunday, we find out that they have another video-tape of [R.H.], another videotape on Sunday. So we get the tape, they e-mail it over to us, we review it. We were told in the e-mail there's nothing exculpatory in there. Well, that is beyond belief to me that in a case where people are changing their stories five thousand times that any interview wouldn't be considered exculpatory or impeachment material, which is under *Brady*[8] as well.

> This is a flagrant violation of *Brady*. We got it Sunday, Judge, this Sunday, two days ago. Didn't make a record of it then, well maybe they just came across it. But, Judge, in that—in that interview she's drawing a sketch of where the car is with Mr. Ketterhagen. Well, we find out later Mr. Ketterhagen was drawing it. But regardless of who was drawing it, Ketterhagen states, well, there's not room—there's not room for the car to be there.

> Judge, that sketch was thrown away in the garbage, a sketch that is saying where [R.H.] drew the car and there wasn't room for it to be there, they throw it away, beyond—beyond comprehension. They throw it in the garbage.

[¶ 36] In response, the prosecutor explained how the late discovery of the second R.H. interview occurred. In short, the State had sent various audiotapes and videotapes the previous weekend for transcripts to be made for use during the trial. The transcriptionist noticed that, on a disk labeled "interview with [R.H.] 11/20/2008" there were actually two interviews—an audiotaped interview and a videotaped interview. The State had not previously noticed the separate audiotaped interview, so no transcript thereof had been provided in discovery. Further, realizing the lateness of the disclosure, the prosecutor agreed to make no effort to use the new-found audiotape at trial. In specific reference to the "R.H. sketch," the prosecutor said the following:

> And as far as the drawing that [defense counsel] was talking about, evidently while they were talking they were asking where the cars were parked she was saying that this car was this direction, this car was this direction and they were talking and referring to something and I asked the officers about that that were there and they said she never drew a map, she never made a drawing, nothing was dated, nothing was signed.

> That evidently someone had drawn a couple of little squares at the bottom of a page and she pointed with her finger and said, "No, this one was over there."

> Now, she says verbally in that tape that she makes a statement that [the victim's] car was parked towards Jackson, she makes that same statement in the video recorded one, that statement is clear. This interview was done before the Defendant was ever arrested, while this was still the police and the Sheriff's Office investigation.

> Whether they kept that document that they drew the two squares on I'm not sure we could even get into evidence, it was never signed, dated. I don't know that if [R.H.] would look at a piece of paper with two squares would even recognize it. But

---

**8.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

whether it would have been or not, Your Honor, that was never retained from that day. It was never anything that was kept in the Sheriff's Office or passed on to us.

We don't have control of what the Sheriff's Office retains in their investigation before it is ever brought to us for charging, Your Honor.

[¶ 37] R.H. was asked about the sketch during cross-examination:

Q. Right. When you were with Mr. Ketterhagen and Mr. Hanson they had you draw on a piece of paper, correct?

. . . .

A. I never drawn [sic] on a piece of paper.

Q. [ ] You never saw a piece of paper that they had and told you to put where the cars were, show them were [sic] the cars were?

A. There was a piece of paper where they asked me about the first turnout coming out of Jackson and they asked where the vehicles were because like I said there was a vehicle that had pulled up behind us.

Q. They didn't ask you about the one down there?

A. I don't recall that, no.

[¶ 38] Finally, Investigator Hanson was asked about the R.H. sketch during cross-examination:

Q. And you sat in on the interview that she testified about today, correct?

A. Correct.

Q. And you guys taped something prior to that interview, did you not?

A. I did.

Q. Okay. And during that interview somebody was drawing pictures of the scene, were they not?

A. Well, yes, I think there was a small sketch.

Q. And whoever drew it, [R.H.]—Mr. Ketterhagen said no it can't be there because that's too close to the road; do you recall that?

A. I don't recall that.

Q. Okay.

A. I don't remember much of that interview as far as the smaller details of it.

Q. Okay. Did you throw—that piece of paper got thrown away, did it not.

A. I have no idea.

Q. Would you consider that piece of paper to be evidence?

A. Possibly, yes.

Q. And you shouldn't throw evidence away, right?

A. Well, what I remember of that there was two small squares down on a piece of paper. I don't think—I don't remember if there was any details to that other than two squares. Honestly I don't even know if it was on a piece of paper.

Q. What was it on, if it wasn't paper?

A. It seems to me like they was pointing to something on the table just, you know, going like that making two small squares. It could have been on a piece of paper I'm not a hundred percent.

Q. You shouldn't throw evidence away?

A. No.

[¶ 39] The parties contend, and we agree, that our review of this issue should be guided by the following standards:

> "[t]he Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. [*Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ] and [*California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ] govern cases in which the government no longer possesses the disputed evidence." *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994) (quoting *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993)).

*United States v. Gomez*, 191 F.3d 1214, 1218 (10th Cir.1999). Further, the

> principles articulated in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the Due Process Clause and the government's destruction or loss of evidence

prior to a criminal trial guide our analysis. Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. The Court in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38.

... The ... "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." [*United States v.*] *Richard,* 969 F.2d [849,] 853–54 [(10th Cir.1992)]....

... To invoke *Trombetta,* a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. However, to trigger the *Youngblood* test, all that need be shown is that the government destroyed "potentially useful evidence." *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337. The Court in *Youngblood* defined "potentially useful evidence" as evidence of which "no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* at 57, 109 S.Ct. at 337 (emphasis added)....

...

... Our inquiry into bad faith "must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 57 n. *, 109 S.Ct. at 336 n. *.

...

... Of course, mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38[.]

*United States v. Bohl,* 25 F.3d 904, 909–12 (10th Cir.1994) (footnote omitted). *See also Young* [*v. State* ], 849 P.2d [754,] 763–65 [ (Wyo.1993) ]; *Gale v. State,* 792 P.2d 570, 587–88 (Wyo.1990); *Wilde v. State,* 706 P.2d 251, 255 (Wyo.1985); and *Wheeler v. State,* 691 P.2d 599, 602–03 (Wyo.1984). *Whitney v. State,* 2004 WY 118, ¶ 59, 99 P.3d 457, 476–77 (Wyo.2004).

[¶ 40] The known facts are: (1) in an interview in 2008, T.B. apparently drew a sketch of something, which sketch was not retained by the law enforcement interviewers, and (2) in a separate interview of R.H. the same year, Captain Ketterhagen drew two small boxes on a piece of paper which boxes appear to have been meant to represent the two vehicles that had stopped alongside the road when the appellant obtained the pistol from R.C., which sketch, like the first one, was not retained by the law enforcement interviewers. On the basis of these facts, the appellant made the following accusation in his new trial motion:

**6. Destroying Evidence:** During the trial it was elicited that the State through not only its employee (Randall Hanson) but also law enforcement that two drawings were used in the interviews of [R.H.] and [T.B.]. These documents were then destroyed by the State. These drawings were potentially exculpatory as both witnesses provided inconsistent details of where things were located in the drawings. At a minimum, the drawings could have been used to impeach the witnesses [sic] credibility. Once again the State's cavalier approach to this destroying of evidence is an indication of its disregard of [the appellant's] right to a fair trial.

[¶ 41] Five factors should be considered in determining whether the State acted in bad faith in this situation: (1) whether the State was on notice by the appellant that he believed the evidence was potentially exculpatory; (2) whether the appellant's assertion that the evidence had exculpatory value was merely conclusory or whether his assertion was supported by objective, independent evi-

dence; (3) whether the State was in possession of or had the ability to control the evidence at the time it received notice from the appellant; (4) whether the evidence was central to the State's case; and (5) whether there was an innocent explanation for the State's failure to preserve the evidence. *United States v. Bohl,* 25 F.3d 904, 911–12 (10th Cir.1994). The first and third factors do not apply in this case, because the loss, destruction, or failure to retain the sketches occurred before any notice from the appellant. As to the second factor, the appellant's assertion that the sketches had exculpatory value is purely conclusory as the record gives us no idea what may have been shown on the T.B. sketch, and R.H. testified that the sketch made during her interview was of an inconsequential fact, that being the placement of the appellant's vehicle and R.C.'s vehicle when R.C. delivered the pistol to the appellant. As to the fourth factor, even if the R.H. sketch was of the crime scene, as may be inferred from Investigator Hanson's testimony, the placement of the vehicles at the scene was not "central to the State's case." And finally, there is nothing in the record to refute the innocent reason for the State to have failed to preserve the evidence—neither sketch appeared to the law enforcement officers involved at the time to have any evidentiary value.

[¶ 42] From all of this, a couple of things are apparent. The exculpatory value of the two sketches is indeterminate at best. The transcript of neither interview appears in the record, leaving us to guess how the sketches may have been used, if at all. Further, we do not know if, or when, the sketches were lost or destroyed, or whether they simply were not retained after the interviews. We can conclude that the State may have been negligent in not retaining the sketches, but that is not sufficient to show that the State acted in bad faith. Under the tests set forth above, the appellant has not shown that his right to the due process of law was violated, and he certainly has not supported the hyperbolic accusations made in his new trial motion. Consequently, we affirm the denial of the new trial motion in regard to this issue.

### *Undisclosed Prior Statement of R.H.*

[¶ 43] The facts underlying this issue were recited in the previous issue. During the trial, a transcriptionist discovered an audiotape of an interview with R.H. on the disk of a videotape of an interview with R.H. Upon learning of the existence of the audiotape, the prosecutors immediately provided a copy to defense counsel. Realizing the late disclosure, the State conceded that it would not attempt to enter the audiotape into evidence, but it also assured the Court that "[R.H.] did not make any statement in that first audio tape that she did not repeat in the videotape, so there was no new information." The appellant's motion that R.H. not be allowed to testify, as a sanction for this late disclosure was taken under advisement, and later denied. In denying the motion, the district court noted that "it appears as if there's nothing really different" on the audiotape, but allowed the appellant to utilize it for cross-examination of R.H.

[¶ 44] The appellant's new trial motion contained the following complaint in regard to the late disclosure of the audiotaped interview:

> 7. **Statement of [R.H.]:** After four days of trial, the defense was notified that a statement of [R.H.] was found that had not been turned over to the defense. Again, this inexcusable attention [sic] to detail concerning *Brady* material constitutes grounds for a new trial if for no other reason than the State failed to comply with *Brady* and its progeny. This has been a subject of argument during the entire duration of trial preparation. This callous approach should not be regarded as mere inconvenience or harmless error as the State's conduct rises to the level of constitutional violations. The defendant's right to a fair trial was violated.

[¶ 45] We will summarily affirm the denial of the new trial motion on this ground because the appellant has utterly failed, either before the district court, or in his appellate brief, to substantiate his allegations of a *Brady* violation. He cites no case law or other authority in the section of his brief dedicated to this issue. He presents a con-

clusion—"The trial court abused its discretion in [allowing R.H. to testify], given the fact that [R.H.'s] testimony placed [the appellant] at the scene of the homicide, *yet was inconsistent in many respects.*" (Emphasis added.) There is nothing in the brief, however, revealing what these inconsistencies may have been, or how the late disclosure of the audiotaped interview affected his ability at trial to deal with those inconsistencies. He does not even make an effort to identify what was exculpatory in the audiotaped interview.

### Did the prosecutor commit misconduct by violating discovery orders?

[¶ 46] Although delineated as a separate issue, this issue "piggybacks" on the issues earlier discussed in this opinion by alleging that prosecutorial "[m]isconduct was implicit and explicit in each of the allegations" in the new trial motion. Specifically, citing *State v. Naple,* 2006 WY 125, ¶ 12, 143 P.3d 358, 361–62 (Wyo.2006), the appellant contends that "[f]ailure to comply with a discovery order is generally recognized as misconduct." Where there has been an objection below, we review claims of prosecutorial misconduct for harmless error; where there has not been an objection below, we review for plain error. *Harris v. State,* 2008 WY 23, ¶¶ 12–14, 177 P.3d 1166, 1170–71 (Wyo.2008). In either case, "our focus is on the prejudice suffered by the defendant." *Smith v. State,* 2009 WY 2, ¶ 26, 199 P.3d 1052, 1059 (Wyo.2009). We consider the entire record, and reversal based upon the alleged violation of a discovery order is appropriate only where substantial prejudice has been shown. *Id.; Lindsey v. State,* 725 P.2d 649, 656–57 (Wyo.1986).

[¶ 47] Once again, we will summarily affirm the district court in regard to this issue. The appellant presents nothing on appeal beyond that which we have already discussed in this opinion. We have not been shown that the appellant was prejudiced by any of the prosecutor's conduct described above, no less prejudiced to the substantial extent that would require reversal. Outrage and hyperbole do not substitute for evidence and cogent argument.

### Did the prosecutor commit misconduct by violating a pre-trial order regarding uncharged misconduct evidence?

[¶ 48] Prior to trial, the appellant filed Defendant's Demand for Speedy Trial and Demand for Notice of Intent to Introduce Evidence Under 404(b).[9] In response, the State filed State's Notice of Intent to Offer W.R.E. 404(b) Evidence at Trial, and State's W.R.E. 404(b) *Gleason* Analysis.[10] In those filings, the State identified with specificity thirteen prior instances of violent conduct by the appellant. The district court heard the W.R.E. 404(b) matter on December 15, 2009, and indicated its intent to rule on it that day. The parties have not, however, identified when the district court may have ruled upon the matter, and this Court was unable to locate any such order in the record. Consequently, it remains a mystery what, if any, order may have been entered.

[¶ 49] In this vacuum, we will attempt to address the issue now raised. During the direct examination of Investigator Ferrin, the prosecutor brought up the subject of the Crime Stoppers call mentioned above, and the following exchange occurred:

Q. When that call name [sic] in to crime stoppers what information was relayed?

A. It was a very short call that came in on the crime stoppers line, identified a suspect.

Q. Who was that?

A. [The appellant.]

Q. When you got that tip do you recall what you did with that?

A. I forwarded that information to the State Division of Criminal Investigation who was handling the lead as the investigating agency for the crime.

9. W.R.E. 404(b) forbids the admission of evidence of "other crimes, wrongs, or acts" to prove the character of a person, but allows the admission of such evidence to prove certain other specified facts.

10. In *Gleason v. State,* 2002 WY 161, 57 P.3d 332 (Wyo.2002), this Court established guidelines for trial courts to follow in determining whether uncharged misconduct evidence was admissible.

Q. When you received that particular tip, did it ring any bells with you?

A. Yes, sir.

Q. What was that?

A. That [the appellant] had come up in previous investigations that we had worked.

Q. From—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Sustained.

Don't—don't—the answer, strike that, please.

[¶ 50]   Because of this last statement by the district court—granting the objection and striking the answer, this issue does not require further analysis. In two separate instructions—Instruction No. 1 and Instruction No. 8—the jury was instructed to disregard any testimony ordered stricken. As stated previously herein, we presume that jurors follow the court's instructions. *Brown*, 953 P.2d at 1177. Moreover, were we to ignore that presumption and look substantively at Ferrin's statement in the context of all the evidence properly admitted at trial, we cannot say that this very general and relatively innocuous comment was so unfairly prejudicial as to require a new trial.

***Did the prosecutor commit misconduct by eliciting testimony from a law enforcement officer that the officer believed a witness was lying during an interview?***

[¶ 51]   As mentioned above in relation to a separate issue, Detective Hollenbach interviewed T.B. At trial, while the State was asking Hollenbach about that interview, the following colloquy occurred:

Q. Did you treat [T.B.] differently than you had treated other individuals in the past that you had interviewed?

A. Yes, sir.

Q. And why is that?

A. Because from early on in the interview it became very apparent that he was lying to me. I wanted to make it clear up front that I was not going to sit there throughout the evening and allow him to do that,

that I was there to get the truth and that would be it.

[¶ 52]   No objection to this question or answer was interposed at trial, so our review is limited to review for plain error. To show plain error, the appellant must prove (1) the record is clear as to the incident alleged; (2) a clear and unequivocal rule of law was violated thereby; and (3) a substantial right was denied to the appellant to his material prejudice. *Wilks v. State*, 2002 WY 100, ¶ 7, 49 P.3d 975, 981 (Wyo.2002).

[¶ 53]   There is no question as to the first plain error factor—Hollenbach's statement that T.B. was lying is clear in the record. In regard to the second factor, there is, indeed, a clear and unequivocal rule of law that forbids one witness to testify as to the credibility of another witness. *Sweet v. State*, 2010 WY 87, ¶¶ 23–24, 234 P.3d 1193, 1202–03 (Wyo.2010). While at first glance, Hollenbach's statement appears to be a violation of that rule, when placed in the context of the entire case, that is not so clear. At the time Hollenbach testified, T.B. had already testified and had admitted that he did not tell "all of the facts" to Hollenbach, just as he gave "wrong information" when he was later interviewed by Investigator Hanson and Captain Ketterhagen. T.B. explained further that, by not telling the truth and by minimizing the situation, he hoped that the officers would believe that he was not present at the crime scene and that "this thing would just go away." In addition, T.B. testified that an attorney told him not to tell what he knew until "there was some kind of deal on the table." In short, this was not a situation where Hollenbach invaded the province of the jury by opining that another witness was lying. The jury's determination of T.B.'s credibility was not "corrupted" by Hollenbach's testimony; rather, Hollenbach merely commented upon something that T.B. had already admitted. For these same reasons, the third plain error factor has not been shown. The appellant was not materially prejudiced by Hollenbach's testimony because T.B. had already admitted to the jury that he did not tell the whole truth during the interviews. In the context of this case, it was not misconduct for the prosecutor to ask

Hollenbach about the T.B. interview as set forth above.

## CONCLUSION

[¶ 54]  The appellant has failed to show that the district court abused its discretion by failing to grant the appellant's new trial motion, or that the prosecutor committed reversible misconduct.  The judgment and sentence of the district court is affirmed.