2017 WY 135

**Joshua Roy Delbert BLACK,
Appellant (Defendant),**

**v.**

**The STATE of Wyoming,
Appellee (Plaintiff).**

**S-15-0295**

Supreme Court of Wyoming.

November 17, 2017

BURKE, Chief Justice.

[¶1] Appellant, Joshua Roy Delbert Black, challenges his conviction for aggravated assault, in violation of Wyo. Stat. Ann. § 6-2-502(a)(i).[1] He contends he was denied a fair trial as a result of prosecutorial misconduct. He also claims that his due process rights were violated because he was required to wear a leg restraint during trial. We find that prosecutorial misconduct occurred when the State failed to comply with the district court's discovery order and when the prosecutor made improper comments during closing argument. We also find that the district court abused its discretion in requiring Appellant to wear a leg restraint at trial without conducting a hearing to evaluate the necessity for the restraint. The cumulative impact of those errors deprived Appellant of a fair trial. Accordingly, we reverse and remand for a new trial.

## ISSUES

[¶2] Appellant presents the following issues:

1. Did the prosecutor commit misconduct when he failed to comply with the court's discovery order?

2. Did the trial court abuse its discretion when it denied Appellant's motion to restrict witness testimony?

3. Did prosecutorial misconduct occur during trial?

4. Was Appellant denied due process of law when he was restrained during trial without an appropriate hearing to determine if restraints were necessary?

5. Was Appellant deprived of a fair trial due to the cumulative impact of the alleged errors?

## FACTS

[¶3] Appellant and Kelli Windsor[2] began dating in California in June 2014. In July, Ms. Windsor moved to Jackson, Wyoming to

Representing Appellant: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Patricia L. Bennett *, Appellate Counsel. Argument by Ms. Bennett.

Representing Appellee: Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Caitlin F. Harper, Assistant Attorney General; Becket B. Hinckley, Special Assistant Attorney General. Argument by Mr. Hinckley.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

---

\* *An order granting Ms. Bennett's Motion to Withdraw was entered on February 14, 2017.*

1. Appellant was also found to be a habitual criminal under the enhancement provisions of Wyo. Stat. Ann. § 6-10-201(a)(ii) and was sentenced to life in prison.

2. At trial, Ms. Windsor, who is also known as Ms. Windsor-Denin, indicated that she preferred to be addressed as Ms. Windsor. Accordingly, we will refer to her as Ms. Windsor in this opinion.

work as a horse-trainer and riding instructor for the children of Jake and Patricia Nichols. The relationship continued after the move and, in October, Appellant moved to Wyoming to live with Ms. Windsor. They had lived together for a week before the incident at issue in this case occurred.

[¶4] On the night of October 26, Ms. Windsor received significant injuries to her head and face.[3] She claimed her injuries were caused when she was attacked by Appellant in their residence. Ms. Windsor did not report the incident to police.[4] She did, however, take pictures and videos of her injuries with her cell phone. Later that evening, she sent text messages to Molly Hufford, nanny for the Nichols children. She provided pictures of her injuries along with the statement: "What Josh did to me tonight so there's witnesses. I can't come in tomorrow." In addition to sending the pictures to Ms. Hufford, Ms. Windsor sent text messages and photos to Appellant and Appellant's friend. Those messages also indicated that Appellant had caused Ms. Windsor's injuries.

[¶5] Ms. Hufford did not see the message until the next morning when she was at the Nichols residence. When she saw the message, she notified her employers. Mr. Nichols went to the residence, and Mrs. Nichols notified the police. When he arrived at the residence, Mr. Nichols found Appellant and Ms. Windsor sleeping in the bedroom and the apartment in disarray. He observed broken furnishings and overturned furniture. Law enforcement arrived a short time later and detained Appellant. Ms. Windsor was transported to the emergency room.

[¶6] Appellant was arrested and charged with one count of aggravated assault causing serious bodily injury in violation of Wyo. Stat. Ann. § 6-2-502(a)(i) (LexisNexis 2013). The Information also contained a "Notice of Enhanced Penalties" and alleged that Appellant was a habitual criminal under Wyo. Stat. Ann. § 6-10-201(a)(ii) with three prior felony convictions. Trial was initially scheduled for April 21, 2015 but was continued and re-scheduled to June 22, 2015 at the request of the State. It was subsequently rescheduled to September 28, 2015 at the request of Appellant after his original defense counsel withdrew and the Public Defender's office was appointed to represent him. New defense counsel filed several discovery motions, including a "Motion to Compel the Discovery of Facebook and Cell Phone Records."

[¶7] The motion to compel was filed on July 8 and alleged:

> [I]t is known that [Ms. Windsor] sent various pictures, text messages, and information prior to, during, and after the alleged event. This evidence may go directly to [Ms. Windsor's] credibility as to her expected testimony; she is the State's most important witness in this case. ... It is believed that some of these records were deleted by [Ms. Windsor] or others[.] [O]btaining records from [Ms. Windsor] is not sufficient and may be inaccurate.

The motion also alleged that:

> It is believed that it is much easier and more convenient for the State to obtain these requested records than the Defendant. It is known, in fact, that such a request for Facebook to provide records is made frequently by law enforcement in Teton County, Wyoming. *See* Records Request at www.facebook.com/records/login (stating that "If you are a law enforcement agent who is authorized to gather evidence in connection with an official investigation, you may request records from Facebook through this system."). Whereas, it is unduly cumbersome and costly, both in time and resources for the Office of the State Public Defender to obtain these records via court subpoena, or subpoena duces tecum, and the required modes of providing notice and service.

The motion requested Facebook and Verizon records from June 1, 2014 through November 30, 2014.

[¶8] A hearing on the motion was held on August 7. At the hearing, the prosecutor

---

3. The injuries included a nasal bone fracture, two orbital fractures, a basilar skull fracture, and brain hemorrhaging.

4. At trial, she indicated that the reason for her failure to report the incident to police may have been due, in part, to the presence of controlled substances in the residence.

advised the court that the State had no objection to the motion. The court granted the motion and entered an order providing that the "State shall exercise due diligence to obtain the requested information and shall promptly request the information from Facebook and Verizon Wireless and provide it to Defendant's counsel."

[¶9] The State subsequently provided an extraction record of text messages from one of Ms. Windsor's cell phones indicating that some messages had been deleted. However, the State did not attempt to contact Verizon or Facebook at any time following the court's order. As a result, on August 28, 2015, Appellant filed a "Motion to Restrict Witness Testimony for Failure to Comply with Discovery and Court Order." In the motion, Appellant sought to exclude the testimony of Ms. Windsor and all law enforcement officers as a sanction for the State's failure to comply with the discovery order.

[¶10] The motion was addressed at a pretrial conference held on September 14 and at a subsequent hearing held on September 16. Following the hearings, the district court entered an order denying the motion for sanctions. In the order, the court stated that it would entertain a defense motion for a continuance and would expedite a new trial setting if Appellant wished to attempt to obtain the information by other means. The defense did not seek a continuance.

[¶11] Appellant also filed a pretrial motion to appear at trial in plain clothes and without restraints. In response, the State advised the court that it had no objection to the motion. The district court granted the motion in part. It ruled that Appellant could appear at trial in plain clothes but indicated that it would reserve a decision on whether Appellant should be restrained in the courtroom until it had an opportunity to hear from the Teton County Sheriff's Office. No additional pretrial hearing on the issue of restraints occurred, and Appellant was required to wear a leg restraint during trial.

[¶12] After a five-day jury trial, Appellant was found guilty of aggravated assault under Wyo. Stat. Ann. § 6-2-502(a)(i). The jury also found Appellant to be a habitual criminal under Wyo. Stat. Ann. § 6-10-201(a)(ii). The

district court sentenced Appellant to life in prison. This appeal followed. Additional facts will be presented as necessary in the discussion below.

## DISCUSSION

### I. Prosecutorial Misconduct

 [¶13] Appellant alleges that the prosecutor committed misconduct by failing to comply with the district court's discovery order and by making improper statements and arguments during trial. The State concedes some instances of prosecutorial misconduct but asserts that the misconduct did not prejudice Appellant. We review allegations of prosecutorial misconduct under the plain error standard if there has been no objection at trial. *Carroll v. State*, 2015 WY 87, ¶ 31, 352 P.3d 251, 259 (Wyo. 2015). Where there has been an objection below, claims of prosecutorial misconduct are reviewed under a harmless error standard.

> Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error ... affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State*, 580 P.2d 1150, 1154 (Wyo. 1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused.

*McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015) (quoting *White v. State*, 2003 WY 163, ¶ 7, 80 P.3d 642, 646 (Wyo. 2003)). "To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'" *McGinn*, ¶ 13, 361 P.3d at 299 (quoting *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1134 (Wyo. 2007)).

## A. Pretrial Misconduct

[¶14] In his first issue, Appellant claims prosecutorial misconduct occurred when the prosecutor failed to comply with the district court's order compelling the State to exercise due diligence to obtain the Verizon and Facebook records requested by Appellant. The State concedes that the prosecutor failed to comply with the order and that the prosecutor made no attempt to contact Verizon or Facebook to obtain the records sought by the defense. The State asserts, however, that no misconduct occurred because the court's order was "improper." According to the State, "If the State was improperly required to provide the information, its failure to do so cannot amount to prosecutorial misconduct requiring reversal."[5] There are several troubling aspects to this claim.

[¶15] First, the State offers no authority for its contention that it does not have to comply with a discovery order if it believes the order was improperly entered. There is, however, authority to the contrary. *See* 4 Wharton's Criminal Law § 618 (15th ed.) ("[T]he fact that an order is erroneous or irregular is no excuse for its being disobeyed."), and cases cited therein. Second, the State fails to acknowledge the undisputed fact that the prosecutor did not object to Appellant's discovery motion. During the hearing on the original discovery motion, the prosecutor told the court that the State had no objections to the motion. He added, "We'll just give them what we can and give it to counsel. It makes sense, it's that simple." The district court relied on that representation. In the court's "Order on Motion to Restrict Witness Testimony" it stated: "In an Order on Pretrial Motions entered August 12, 2015, *and on the basis that the motion was unopposed by the State*, the Court granted Defendant's motion to compel." (Emphasis added.) And finally, this issue was not raised below. As a general rule, we will not consider claims raised for the first time on appeal. *Davis v. City of Cheyenne*, 2004 WY 43, ¶¶ 25–27, 88 P.3d 481, 489-90 (Wyo. 2004). We recognize only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered. *Id.* "This court has taken a dim view of a litigant trying a case on one theory and appealing it on another. ... Parties are bound by the theories they advanced below." *Id.* (quoting *WW Enterprises, Inc. v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo. 1998)). The issue raised by the State does not present a jurisdictional question and it is not of such a fundamental nature that it must be considered. We will not consider it further.

[¶16] At the hearing on the discovery motion, the district court asked the prosecutor: "So you're going to attempt to comply with that request to the extent that it's reasonably possible to do so?" The prosecutor replied: "Absolutely." The district court's order on discovery was explicit: "The State shall exercise due diligence to obtain the requested information and shall promptly request the information from Facebook and Verizon Wireless and provide it to Defendant's counsel." Despite the clear language of the order, the State never contacted Verizon or Facebook to obtain the records. The State offers no justification for that failure. There is indication in the record that it would not have been difficult for the State to make that request.

[¶17] One of the exhibits in support of the motion for sanctions was an email from the prosecutor to defense counsel. The email contained a Facebook policy for addressing record requests from law enforcement. According to the policy, law enforcement "may expeditiously submit formal preservation requests through the Law Enforcement Online Request System at facebook.com/records, or by email ...." Once the request is received, according to the policy, Facebook "will search for and disclose data that is specified with particularity in an appropriate form of legal process and which we are reasonably able to locate and retrieve."

[¶18] Additionally, during the hearing on the motion for sanctions, the State presented

---

5. The State claims the court's order was improper because it does not have an obligation to discover exculpatory evidence outside of its possession under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

the testimony of Special Agent Jim Bonich of the FBI, who described the process for obtaining information from Facebook. Agent Bonich testified that he assists the prosecutor and law enforcement in Teton County "as I'm able when I'm requested." According to Agent Bonich, Facebook requires a preservation request "to maintain content and other information from being deleted." Agent Bonich testified that he had made preservation requests to Facebook in the past, that he had always received a response to those requests, and that Facebook had never denied any of those requests. Agent Bonich testified that he discussed the case with the prosecutor; however, he did not contact Facebook in this case because he was never asked to do so by the prosecutor. Similarly, the Teton County Sheriff testified that the prosecutor never informed him of the existence of the court's order.

[¶19] Defense counsel summed up the importance of the requested information in response to a question from the court during the hearing on the motion for sanctions:

> THE COURT: So what would you expect to be produced that would be enlightening?
>
> [DEFENSE COUNSEL]: ... This is a couple, particularly [Ms. Windsor], she documented everything. This is a woman who posted and texted and selfied constantly.
>
> There's discrepancies in her timeline that night of where she was. And since October the State has known that she's documented her whereabouts and used that phone and information from Facebook posts to help her reconstruct her timeline and story and now that's not being turned over to the [defense].
>
> THE COURT: What evidence is there of discrepancies of where she was?
>
> [DEFENSE COUNSEL]: For example, she says she was at Teton Village that night. I don't have any information that she actually was at Teton Village that night. ... [T]hey are using that as where she was out and about. There is information that she left the night of the assault and that she was at least in her car and she hit a bear trash can backing into it the night of the assault.

Her whereabouts on where these things happened are important to her entire credibility on how she even remembers where she was. She used her phone and her postings to tell law enforcement, to jog her own memory to tell them what had happened that night. To tell them her story was that she was at the residence and she had been assaulted by Mr. Black.

> And I can't verify when she left and went to Teton Village in particular or who she was with when she did it because that information is missing, except for it being written in a law enforcement report and talked about in the interviews.
>
> THE COURT: Okay.

[¶20] The State contends that Appellant cannot demonstrate prejudice because he "cannot assert with any certainty that the information that may have been contained on Ms. Windsor's Facebook page or in her Verizon Wireless phone records would have been exculpatory such that it would have changed the character of the jury's verdict." Typically, there would be merit in the State's argument. In this case, however, it is undermined by the fact that it was the State's obligation, under the court order, to obtain the information. The State also claims that Appellant was not prejudiced because he could have requested the information from Facebook and Verizon. That contention was addressed by the district court. Although the district court denied the motion to restrict witness testimony, it did not find that Appellant was not prejudiced by the State's failure to perform. As stated in the court's order denying sanctions: "While Defendant could have requested the discovery itself from Facebook and Verizon, presumably Defendant did not make those requests because it justifiably relied on the Court's Order that the State would obtain the requested information." The order denying sanctions was entered ten days prior to trial. By then, Appellant had been in custody for more than ten months. Under the circumstances, his decision not to seek a continuance should not be deemed a waiver of the claimed error.

[¶21] We have previously indicated that failure to comply with a discovery order

should not be tolerated. In another case addressing the State's failure to provide discovery in a criminal case, we stated that, "The failure to comply with a discovery order is to be deplored." *State v. Naple*, 2006 WY 125, ¶ 29, 143 P.3d 358, 367 (Wyo. 2006) (quoting *Lindsey v. State*, 725 P.2d 649, 655 (Wyo. 1986)). We find the prosecutor's failure to comply with the order constitutes misconduct.[6]

## B. Denial of Appellant's Motion to Restrict Witness Testimony

[¶22] As noted above, Appellant sought an order "restricting the Teton County Sheriff's Department and [Ms. Windsor] from testifying" as a result of the prosecutor's failure to comply with the discovery order. The district court denied the motion but indicated that it would "entertain a motion for a continuance" so that Appellant could "seek the discovery information directly." Appellant challenges that decision in this appeal.

[¶23] We review the district court's decision for an abuse of discretion: A trial court has discretion in determining the proper sanction for a party's violation of its discovery responsibilities. *Lawson v. State*, 994 P.2d 943, 946 (Wyo. 2000); *Lindsey v. State*, 725 P.2d 649, 655 (Wyo. 1986). "The decision of the court in addressing the breach of a discovery order will be set aside only for an abuse of discretion." *Lindsey*, 725 P.2d at 655. In determining whether the trial court abused its discretion, "the ultimate issue is whether or not the court could reasonably conclude as it did." *Lawson*, 994 P.2d at 947.

*Naple*, ¶ 8, 143 P.3d at 360-61.[7] In determining the appropriate sanction for the State's

---

6. The State also contends that no prejudice occurred because the evidence against Appellant was overwhelming. The State makes the same argument in response to all claims of error. We will address the State's contention in our discussion of cumulative error below, at ¶¶ 45-51.

7. As noted above, we review claims of prosecutorial misconduct for harmless error when there has been an objection below. *McGinn*, ¶ 13, 361 P.3d at 299. We have also stated, however, that the decision granting or denying a remedy for prosecutorial misconduct is reviewed for an abuse of discretion. Our case law is not clear on how these standards relate to one another when the discovery violation constitutes prosecutorial misconduct. In *Yellowbear v. State*, 2008 WY 4, 174 P.3d 1270 (Wyo. 2008), the appellant moved for a new trial due to alleged prosecutorial misconduct, and the district court denied the motion. We noted that the denial of a motion for mistrial is reviewed for an abuse of discretion, but then proceeded to conclude that "the State's rebuttal closing argument did not constitute prosecutorial misconduct in that nothing said therein was unfairly prejudicial so as to deprive the appellant of his right to a fair trial or otherwise impinge upon his substantial rights." *Id.*, ¶¶ 66, 75, 174 P.3d at 1295, 1298. Similarly, in *Willoughby v. State*, 2011 WY 92, 253 P.3d 157 (Wyo. 2011), the appellant moved for a new trial based, in part, on the prosecution's violation of a discovery order. We stated that we would review the denial of appellant's motion for an abuse of discretion. *Id.*, ¶ 8, 253 P.3d at 161. However, we reviewed the alleged violation of a discovery order for prejudicial error:

Specifically, citing *State v. Naple*, 2006 WY 125, ¶ 12, 143 P.3d 358, 361-62 (Wyo. 2006), the appellant contends that "[f]ailure to comply with a discovery order is generally recognized as misconduct." Where there has been an objection below, we review claims of prosecutorial misconduct for harmless error; where there has not been an objection below, we review for plain error. *Harris v. State*, 2008 WY 23, ¶¶ 12-14, 177 P.3d 1166, 1170-71 (Wyo. 2008). In either case, "our focus is on the prejudice suffered by the defendant." *Smith v. State*, 2009 WY 2, ¶ 26, 199 P.3d 1052, 1059 (Wyo. 2009). We consider the entire record, and reversal based upon the alleged violation of a discovery order is appropriate only where substantial prejudice has been shown. *Id.*; *Lindsey v. State*, 725 P.2d 649, 656-57 (Wyo. 1986).

Once again, we will summarily affirm the district court in regard to this issue. The appellant presents nothing on appeal beyond that which we have already discussed in this opinion. We have not been shown that the appellant was prejudiced by any of the prosecutor's conduct described above, no less prejudiced to the substantial extent that would require reversal.

*Willoughby*, ¶¶ 46-47, 253 P.3d at 173. Our precedent also contains numerous examples of cases where we have reviewed for prejudicial error when the district court imposes a remedy for prosecutorial misconduct. *See, e.g., Butcher v. State*, 2005 WY 146, ¶¶ 41-42, 123 P.3d 543, 555-56 (Wyo. 2005) (*overruled on unrelated grounds by Wilkerson v. State*, 2014 WY 136, 336 P.3d 1188 (Wyo. 2014)) (affirming district court's decision striking questioning and testimony as a result of the prosecutor's alleged misconduct in referring to prior convictions during cross-examination); *Condra v. State*, 2004 WY 131, ¶¶ 28, 30, 100 P.3d 386, 393-94 (Wyo. 2004) (reversing

failure to comply with the discovery order, the district court evaluated the three factors identified in *Naple*, ¶ 12, 143 P.3d at 362. Those factors are (1) the reasons the State delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance. In *Naple*, ¶ 13, 143 P.3d at 362, we emphasized that dismissal should only be granted under extraordinary circumstances.

[¶24] After applying the factors set forth in *Naple*, the district court determined that the State's case was largely dependent on the testimony of Ms. Windsor and that granting the motion would "eviscerate the State's case." Ordinarily, we would find no abuse of discretion in the district court's decision not to impose the requested sanction. In this case, however, we find the court's decision was based on the unsupportable premise that the State acted in good faith when it failed to comply with the discovery order.

[¶25] In applying the *Naple* factors, the district court found that the State "tried to enlist the help of law enforcement to comply with the discovery order." The court then concluded that the State had "complied with the spirit of the Court's Order, if not the letter of it." There is no factual support in this record for that conclusion. The State was ordered to "exercise due diligence to obtain the requested information and [to] promptly request the information from Facebook and Verizon Wireless and provide it to Defendant's counsel." It is undisputed that the State never obtained the requested information and, more significantly, never made any attempt to obtain the information. When asked on direct examination about his conversation with the prosecutor, Sheriff Whal-

en testified that the prosecutor had not informed him that the court had issued the discovery order. He stated "I don't know that I received—I didn't see any order. *I [didn't] know that I was under any order by the Court.*" (Emphasis added.) Similarly, Agent Bonich stated that the prosecutor did not ask him to contact Facebook in this case. Agent Bonich stated, however, that he had made preservation requests to Facebook in the past and had always received a response, and that Facebook had never denied any of his preservation requests. Sergeant Stanyon gave similar testimony. He stated that the Sheriff's office had not sent a preservation request to Verizon or Facebook because he "wasn't told to do so" by the prosecutor. Ultimately, the State never contacted Facebook or Verizon. Instead, it attempted to convince the district court that compliance would be futile.

[¶26] Additionally, and perhaps more significantly, our decision in *Naple* made it clear that the district court, in addressing the issue, "should impose the least severe sanction which will ensure the State's compliance with its discovery responsibilities." *Id.*, ¶ 24, 143 P.3d at 365. The offer of a continuance does not satisfy that requirement. It does not ensure that the State will comply with its discovery obligations. Instead, it absolves the State of any responsibility to produce the information and shifts that responsibility to Appellant.[8]

[¶27] Moreover, in reviewing the adequacy of a sanction order, we have recognized that there is a deterrent aspect that should be considered. In *Salinas v. State*, 2016 WY 97, 380 P.3d 647 (Wyo. 2016), we considered the appropriateness of a sanction order entered by the district court based upon the State's failure to comply with its discovery obligations. In that case, the sanction order re-

---

district court's denial of a motion for a new trial based on cumulative effect of prosecutorial misconduct); *Metzger v. State*, 4 P.3d 901, 911 (Wyo. 2000) (affirming district court's decision striking argument as a result of the prosecutor's alleged misconduct in referring to evidence of prior wrongful acts by appellant). However, we need not resolve any tension between the standards of review because we reach the same result under either standard in this case.

8. The dissent concludes it was reasonable for the district court to order a continuance. We note, however, that the district court's order states that it would "entertain a motion for a continuance." The district court's order does not provide any remedy that was not otherwise available to Appellant.

stricted the use of certain evidence. We affirmed that decision, stating:

> the sanction provided a fair balance based upon the nature of the evidence and discovery dispute surrounding it. This ruling was not without meaning—the State lost its ability to let the jury see the screenshots and have them to study as much as it wished during deliberations, as it could have if they had been timely produced. This should provide some deterrent to future violations.

*Id.*, ¶ 20, 380 P.3d at 651 (footnote omitted).

[¶28] In contrast to the order entered in *Salinas*, the order entered in this case has no deterrent effect. There are no consequences to the State for failing to perform. Whether any pertinent information is contained in the Verizon or Facebook records is still unknown. We still are without any explanation for the State's failure to comply with the order. This could have been avoided if the district court, in response to the motion, had ordered the State to comply with the discovery order by a date certain. If the State again failed to comply, more severe sanctions could be imposed. If the State did comply, the district court would be in a position to make appropriate orders based upon the responses received from Facebook and Verizon, rather than speculating on whether the information existed. Based upon the foregoing, we are forced to conclude that the district court abused its discretion.[9]

### C. Trial Misconduct

[¶29] The prosecutor's failure to comply with the court's discovery order is not the only instance of misconduct relevant to our decision. Appellant also contends that prosecutorial misconduct occurred during closing argument. Appellant asserts that the prosecutor improperly vouched for law enforcement and the quality of the investigation and that he made improper argument designed to appeal to the passion or prejudice of the jury. He also asserts that the prosecutor made improper comments personally attacking defense counsel.

[¶30] Because Appellant did not object to any of the prosecutor's statements at trial, we review for plain error. *Carroll*, ¶ 31, 352 P.3d at 259. To establish plain error, Appellant must show: (1) the record clearly reflects the incident urged as error; (2) a violation of a clear and unequivocal rule of law; and (3) that he was materially prejudiced by the denial of a substantial right. *Id.*, ¶ 11, 352 P.3d at 255 (quoting *Masias v. State*, 2010 WY 81, ¶ 20, 233 P.3d 944, 950 (Wyo. 2010)). The State does not dispute that several of the prosecutor's statements violated a clear and unequivocal rule of law and that the misconduct is clearly reflected in the record.[10]

[¶31] The State concedes the prosecutor committed misconduct when he vouched for the skill of the investigating officers. During closing, the prosecutor stated: "I have been stunned by the police work here. I used to be in Cheyenne, the police work that this detective has done has been as complete as anything I've ever seen. All texts, everything." The State also concedes the prosecutor committed misconduct during his rebuttal, where he stated there "might be a few bad [law enforcement officers], but there aren't any around here." The State also concedes that the prosecutor's statements to the jury that a particular officer involved with the investigation was "good" and that ... "[the lead detective] has done unbelievable police work" were improper.

---

9. In response to the dissent, we wish to make it clear that we are not saying that the district court abused its discretion in denying Appellant's motion to preclude the victim and law enforcement from testifying. Such a remedy would have effectively gutted the State's case and should only be imposed in rare circumstances. *Naple*, ¶ 13, 143 P.3d at 362. Here, the district court essentially decided not to impose any sanction and based that decision, in part, on a finding of prosecutorial good faith that was not supported by the evidence. On remand, if the matter arises, the district court shall fashion an appropriate remedy in accordance with this opinion.

10. Appellant also asserts that there were other instances of prosecutorial misconduct. In general, the State concedes that those incidents are clearly reflected in the record but disputes that any clear and unequivocal rule of law was violated. In light of the decision we reach on the errors conceded, it is not necessary to address Appellant's additional claims of misconduct.

■ [¶32] We have previously recognized that such statements impermissibly invade the province of the jury to make credibility decisions.

> The law is [ ] clear that it is the jury's role to determine the credibility of witnesses and a prosecutor may not elicit opinions concerning witness credibility. *Ogden [v. State,* 2001 WY 109,] ¶ 21, 34 P.3d [271,] 276 [ (Wyo. 2001) ], citing *Huff v. State,* 992 P.2d 1071, 1079 (Wyo. 1999) and *Stephens [v. State],* 774 P.2d [60,] 68 [ (Wyo. 1989) ]. The law is equally clear that a prosecutor cannot personally vouch for the credibility of a state's witness. *Dysthe v. State,* 2003 WY 20, ¶ 29, 63 P.3d 875, 886 (Wyo. 2003).

*Fennell v. State,* 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015); *see also Guy v. State,* 2008 WY 56, 184 P.3d 687 (Wyo. 2008). The comments in this case are very similar to those we found improper in *Fennell.* In that case, the prosecutor told the jury in closing argument:

> —We know [Mr. Fennell delivered cocaine to the informant] because the agents did their job incredibly well.

> —Again, fortunately, these officers and agents are incredibly good at their job.

*Id.,* ¶ 42, 350 P.3d at 725. We concluded that the prosecutor's statements involved his own opinion as to the quality of the investigation:

> These statements are similar to statements we found improper in *Guy v. State,* 2008 WY 56, 184 P.3d 687 (Wyo. 2008). There, the prosecutor stated: "... I stand behind Sergeant Brown and the investigation that was conducted in this matter." We concluded the comment improperly vouched for the credibility of the investigation. Likewise in *Dysthe,* ¶ 30, 63 P.3d at 886, we held the prosecutor improperly vouched for the State's witnesses when he stated that he worked with the investigators and could guarantee their investigations were not arbitrary.

> ... In the present case, the prosecutor's comments involved his own opinion or experience of the incredible job the agents did, something the jury had not experienced and one of the very questions the jury had to resolve for itself.

*Id.,* ¶¶ 42-43, 350 P.3d at 725. In *Fennell,* we determined that the comments were improper because the prosecutor "was asserting his belief based on his personal opinion or experience that the agents did an incredible job, thus creating the risk that the jurors would view him as an authority whose knowledge and opinions carried greater weight than their own." *Id.,* ¶ 43, 350 P.3d at 725. The same is true in this case. The prosecutor's statements violated well-established rules against vouching for the skill or credibility of a witness.

■ [¶33] The State also agrees that the prosecutor committed misconduct during closing argument by making comments intended to appeal to the passion or prejudice of the jury. As we have previously stated, "In presenting closing argument, the prosecutor is entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function. ... Argument designed to appeal to the juror's passion or prejudice is improper." *English v. State,* 982 P.2d 139, 148 (Wyo. 1999) (citations omitted). The State acknowledges that the prosecutor committed misconduct at the beginning of his closing argument, when he stated:

> I'm going on my 16th year as a prosecutor. I've seen child abuse. I've seen homicides. I've seen [aggravated] assaults, rapes, stabbings, beatings, horrible car wrecks, autopsies from the youngest to the oldest and I always think there's nothing left to shock me.

> That is what got this entire case started.

The State concedes the prosecutor also committed misconduct when he stated what he would have done had his wife sustained similar injuries. The prosecutor stated, "I see my wife like that she's at St. John's [Hospital] in an instant." We have previously noted that arguments calculated to inflame the passion or prejudice of the jury violate ABA Standards for Criminal Justice regarding argument to the jury. *See, e.g., Watkins v. State,* 2016 WY 108, ¶ 14, 383 P.3d 1080, 1083 (Wyo. 2016); *Carroll,* ¶ 32, 352 P.3d at 259; *see also Solis v. State,* 2013 WY 152, ¶ 50, 315 P.3d 622, 633 (Wyo. 2013) ("Remarks and evidence that tend to inflame the passions or preju-

dices of a jury cross the line separating fact from emotion.").

[¶34] Finally, the State concedes that the prosecutor committed misconduct by making comments attacking defense counsel. The prosecutor alternately and repeatedly stated that defense counsel's arguments and questioning were "offensive," "nuts," "laughable," and "bizarre," and that they took his breath away. As we have said previously, "A personal attack by the prosecutor on defense counsel is improper." *English*, 982 P.2d at 148 (citing *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985)).

[¶35] The State's concession in this case was made prior to our recent decision in *Hamilton v. State*, 2017 WY 72, ¶ 14, 396 P.3d 1009, 1014 (Wyo. 2017). In that case, we determined that the prosecutor's characterization of defense arguments as "ridiculous," "absurd," and "bizarre," did not amount to misconduct. We concluded that: "The prosecutor's remarks were related to the prosecution's view of the defense's case, and do not amount to prosecutorial misconduct. Though ill-advised, the comments did not transgress a clear and unequivocal rule of law." *Id.*, ¶ 14, 396 P.3d at 1014. Many of the comments challenged by Appellant in this case could be viewed as merely close to the line, "ill-advised" comments reflecting the prosecutor's view of the defense's case. However, the prosecutor also asserted that aspects of defense counsel's argument were "offensive." Such a comment, we believe, crosses the line. It is an improper, personal attack on defense counsel. It is the type of remark that elevates the impact of the other comments – that defense counsel's statements were "nuts," "laughable," "bizarre," and that they took his breath away. Viewed in their totality, we cannot conclude that the prosecutor's comments were merely "ill-advised." They were an improper attack on defense counsel and violated a clear and unequivocal rule of law.

## II. *Asch* Hearing

[¶36] Appellant also contends he was denied due process of law because he was required to wear a leg brace in the presence of the jury. He asserts that the physical restraint was imposed without the hearing mandated by our decision in *Asch v. State*, 2003 WY 18, ¶ 62, 62 P.3d 945, 964 (Wyo. 2003), and that there is no justification for the restraint appearing in the record. We agree with Appellant.

[¶37] Appellant filed a pretrial motion to appear at trial in plain clothes and without restraints. The State did not file a response to the motion but advised the court during the hearing on pretrial motions: "On the motion regarding civilian clothes, shackles and all that jazz, of course we don't object to any of that." The court granted the motion for Appellant to appear in civilian clothes but, despite the lack of objection from the prosecution, took the motion regarding physical restraints under advisement. In its "Order on Pretrial Motions" the court stated:

The Court shall discuss with the Teton County Sheriff's Office whether restraints are needed for Defendant and if so, whether the restraints can be made not visible to the jury. The Court shall direct the Teton County Sheriff's Office to take reasonable precautions to transport Defendant outside the presence and visibility of the jury.

No other hearing on the issue occurred prior to trial.

[¶38] On the first day of trial, the following discussion occurred outside the presence of the jury:

[DEFENSE COUNSEL]: ... I am concerned about the leg brace for that purpose. Anytime Mr. Black has to walk back with you into chambers, which is his right to do so as you know and I would like him to be there, he is going to have a pretty funny limp back and forth. And that does give me concern on how he's viewed by the jury back and forth into chambers.

THE COURT: Well, how is it? I should have put that on myself to try to see how it felt to walk with it. Can you walk normally with it?

[APPELLANT]: No, absolutely not. When you stand up it automatically locks. Unless you either walk like your [sic] squatting like a duck walk or if you walk straight-legged. And if I stand up and don't pull my pant down, the brace—you can see the

brace from the pant leg. And unless I get up and actually pull it down every time I stand up it's visible. But it automatically locks.

[PROSECUTOR]: I mean I think that the considerations are reasonable accommodation to ensure that the jury doesn't know. He's not chained to an eyebolt to the floor. He doesn't have belly chains on. He's not in stripes. I mean that's the ... least restrictive.

I talked to [the Sheriff's Deputy], he said that the shock thing was either a bracelet or an anklet, which doesn't make them feel comfortable. I mean if he wants to go back to the shackles on the legs and you want to put·a curtain over the top of the desk, I think that would work too. But the problem is every time he moves you're going to hear the shackles because the shackles don't have any plastic or rubber around them that would make them not make any sound, at least that's my understanding. How much more reasonable can you be, that's under his pants.

[APPELLANT]: But it's visible when you walk.

THE COURT: Well, it could be—a lot of us around Jackson have big knee braces from skiing and surgeries and stuff, too. Well, you know, it seems reasonable to me right now. It seems like a reasonable balance of Mr. Black's rights and it's not unduly prejudicial and balancing any—just on the side of being safe. If that becomes an issue here I guess I'll have to address it.

[¶39] In *Asch*, ¶ 57, 62 P.3d at 962, we noted that "The shackling of a criminal defendant in the presence of a jury is universally condemned, although reversal of a conviction in such circumstance is not automatic." We quoted at length from an opinion of the Supreme Court of Washington analyzing cases from across the country and summarizing the rationale for the general rule:

Courts have recognized that restraining a defendant during trial infringes upon this right to a fair trial for several reasons. The one most frequently cited is that it violates a defendant's presumption of innocence.

...

The presumption of innocence, although not articulated in the Constitution, "is a basic component of a fair trial under our system of criminal justice." *Estelle* [*v. Williams*], 425 U.S. [501], 503, 96 S.Ct. 1691, [48 L.Ed.2d 126 (1976) ].

...

Courts have recognized that the accused is thus entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man. ... Courts of other jurisdictions, including our own, have long recognized the substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear prison garb, is handcuffed or is otherwise shackled. ...

Shackling or handcuffing a defendant has also been discouraged because it tends to prejudice the jury against the accused. ... Measures which single out a defendant as a particularly dangerous or guilty person threaten his or her constitutional right to a fair trial. ... The Supreme Court has stated that use of shackles and prison clothes are *"inherently prejudicial"* because they are "unmistakable indications of the need to separate a defendant from the community at large." *Holbrook* [*v. Flynn*], 475 U.S. [560], 568-69, 106 S.Ct. 1340, [89 L.Ed.2d 525 (1986) ] (emphasis added).

When the court allows a defendant to be brought before the jury in restraints the "jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers." [*State v.*] *Williams*, 18 Wash. [47], 51, 50 P. 580 [ (1897) ]. ...

...

Shackling or handcuffing a defendant has also been discouraged because it restricts the defendant's ability to assist his counsel during trial, it interferes with the right to testify in one's own behalf, and it offends the dignity of the judicial process. ...

...

When determining whether restraints should be used during a courtroom proceeding this court has stated:

"A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be 'potentially dangerous' is a failure to exercise discretion."

[*State v.*] *Hartzog*, 96 Wash.2d [383,] 400, 635 P.2d 694 [ (1981) ].

*Id.*, ¶ 57, 62 P.3d at 962–63 (quoting *State v. Finch*, 137 Wash.2d 792, 975 P.2d 967, 997-99, *cert. denied*, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999)) (emphasis in original). We further noted that, because of the "unacceptable risk" that jurors may not be fully conscious of the effect that shackling will have on their attitude toward the accused, "the issue of the necessity for shackling or other restraints must be addressed by the trial court before such prejudice may arise." *Asch*, ¶ 59, 62 P.3d at 964.

[¶40] Ultimately, we held that, in order to ensure a trial free from inherent prejudice, defendants shall not be shackled or otherwise physically restrained in the courtroom during a jury trial "unless the State has first moved that such measures be utilized, the court has heard such motion, and after allowing the defendant an opportunity to contest the motion, the court has stated on the record the compelling reasons justifying the measures." *Asch*, ¶ 62, 62 P.3d at 964. The State has the burden of establishing the necessity for particular restraints and that such restraints are the least drastic effective measure available. *Id.* When exercising its discretion, the court should consider at least the following factors:

[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes, his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Id.*, ¶ 62, 62 P.3d at 965.

[¶41] In this case, it is undisputed that the State did not file a motion seeking the imposition of restraints. Instead, the State told the court at the pretrial hearing that it had no objection to allowing Appellant to appear at trial without restraints. It is also undisputed that no hearing, as required by *Asch*, occurred. The district court apparently reached its decision to impose restraints after consultation with the Teton County Sheriff's Office. In *Asch*, we denounced that approach. We held that the trial court "must consider alternatives, and may not rely blindly on the judgment of correctional officers." *Id.*, ¶ 62, 62 P.3d at 964.

[¶42] In *Asch*, we mandated a hearing to establish on the record justification for the imposition of trial restraints. At that hearing, the defendant must be provided an opportunity to contest the imposition of restraints. If the Court is going to impose restraints, it must state "on the record the compelling reasons justifying the measures." *Id.*, ¶ 62, 62 P.3d at 964. That did not happen here. There is no justification for the restraints appearing in the record, and there is no indication that the court considered the factors we identified in *Asch* before determining that restraints were necessary. Appropriately, the State concedes that the district court's decision to restrain Appellant constitutes an abuse of discretion.

[¶43] When restraints are imposed without a hearing and proper support in the record, the State has the burden on appeal of proving, beyond a reasonable doubt, that the restraint did not result in prejudice to the defendant. *Duke v. State*, 2004 WY 120, ¶ 29, 99 P.3d 928, 941 (Wyo. 2004). The State contends, in part, that Appellant was not prejudiced because the restraint was not visible to the jury. Based upon our review of the record, we are forced to conclude that the

State has failed to establish that the restraint was not seen by the jury.

[¶44] Visibility of the restraint was addressed during a brief discussion held on the first day of trial. As noted above, Appellant stated:

> When you stand up it automatically locks. Unless you either walk like your [sic] squatting like a duck walk or if you walk straight-legged. And if I stand up and don't pull my pant down, the brace—you can see the brace from the pant leg. And unless I get up and actually pull it down every time I stand up it's visible. But it automatically locks.

The State did not dispute that description at trial and does not take issue with it here. It has failed to establish that the restraint was not seen by the jury.

### III. Cumulative Error

▬▬ [¶45] There is no question that errors occurred in this case. The only question is whether Appellant was prejudiced by the errors. In light of the numerous errors, we find it appropriate to apply the doctrine of cumulative error in determining whether Appellant was prejudiced.

▬▬ [¶46] Cumulative error occurs when "two or more individually harmless errors ha[ve] the potential to prejudice the defendant to the same extent as a single reversible error." *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016) (quoting *Guy*, ¶ 45, 184 P.3d at 701).[11] In reviewing for cumulative error, we consider only those matters which we have concluded constitute error. *Watts*, ¶ 23, 370 P.3d at 112. We reverse a conviction only when the accumulated effect of the errors "constitutes prejudice and the conduct of the trial is other than fair and impartial." *Id.* (quoting *Alcala v. State*, 487 P.2d 448, 462 (Wyo. 1971)). "Without question cumulative error may assemble in such proportion that reversal is required." *Schmunk v. State*, 714 P.2d 724, 726 (Wyo. 1986).

[¶47] The State asserts that Appellant was not prejudiced by the errors because the evidence against Appellant was "overwhelming." There is some merit in the State's contention. The evidence against Appellant was substantial. However, based upon our review of the entire record, we cannot conclude that it was so strong that the errors can be disregarded.

[¶48] Ms. Windsor was the State's key witness and her credibility was at issue throughout the trial. She admitted that her memory of the events of October 26 was "pretty foggy." Indeed, her testimony revealed that she did not remember many of the events of that day. The evidence indicated that she was under the influence of alcohol, marijuana, and Ambien at the time she was injured. She did not remember being in her vehicle on the night in question, where she may have traveled, or how her blood was transferred to the steering wheel. The attack was alleged to have occurred at the residence; however, nearby neighbors did not see or hear any disturbance. It is also undisputed that law enforcement used information from her cell phone and Facebook account to "help reconstruct her memory of the events." Ms. Windsor deleted some of that information. Additionally, some of that information may have merely been hidden from public view.

[¶49] There is no question that prosecutorial misconduct occurred prior to and during trial. The prosecution, at a minimum, interfered with Appellant's opportunity to discover potentially exculpatory information by failing to comply with the pretrial discovery order. It violated long-established prohibitions against vouching for the competence of law enforcement officers and the quality of the investigation. It made improper arguments appealing to the passion and prejudice of the jury and personally attacking defense counsel.

[¶50] As we noted in *McGinn*, "Society wins not only when the guilty are convicted but when criminal trials are fair; our system

---

11. Typically, our cumulative error analysis involves the impact of "harmless" errors. This makes sense because if one error satisfies the prejudice threshold, consideration of other errors may not be necessary. In this case, we have determined that discussion of all errors is warranted and do not decide whether any of the errors, standing alone, would have justified reversal.

of the administration of justice suffers when any accused is treated unfairly." *Id.*, ¶ .15, 361 P.3d at 299 (quoting *Beaugureau v. State*, 2002 WY 160, ¶ 16, 56 P.3d 626, 634 (Wyo. 2002)). The prosecutor's role in ensuring a fair trial cannot be understated. As the Supreme Court has noted with respect to federal prosecutors:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) (*overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). *See also Lawson v. State*, 2010 WY 145, ¶ 20, 242 P.3d 993, 1000 (Wyo. 2010) ("The right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment, imposes on States certain duties consistent with their sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions.") (quoting *Cone v. Bell*, 556 U.S. 449, 451, 129 S.Ct. 1769, 1772, 173 L.Ed.2d 701 (2009)).

[¶51] There is also no dispute that Appellant was restrained at trial without the requisite hearing, and we have determined that the State has failed to establish that the restraints were not seen by the jury. Imposition of restraints, without justification appearing in the record, undermines the "presumption of innocence" to which all defendants, including Appellant, are entitled. We are convinced that, because of the cumulative effect of these errors, Appellant was denied a fair trial.

[¶52] We reverse and remand for a new trial.

KAUTZ, Justice, dissenting.

[¶53] The majority concludes that errors occurred at trial in three areas, and the combined effect of those situations requires a new trial. I respectfully reach different conclusions.

## Compliance with the District Court's Discovery Order

[¶54] Mr. Black's primary claim in this case is that the prosecutor committed "prosecutorial misconduct" by failing to comply with a discovery order entered late in the case, and based solely on the prosecutor's agreement to provide the requested information. The majority opinion suggests there may be both a review of the district court's decision about the discovery violation (under an abuse of discretion standard of review), and a separate review of the claim of prosecutorial misconduct (under a standard of review called harmless error). I do not believe that such separate reviews can exist, nor do I find that a *de novo* review for "harmless error" is appropriate where a trial judge has ruled on the claimed error. Further, I do not find that the trial court abused its discretion in dealing with the discovery problem in this case.

[¶55] Not every mistake made by a prosecutor qualifies as prosecutorial misconduct, and I conclude that the discovery problem in this case is not "prosecutorial misconduct."

> Prosecutorial misconduct is "[a] prosecutor's improper or illegal act (or failure to act), esp. involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo.2013) (citations omitted). "Prosecutorial misconduct claims are not intended to provide an avenue for tactical sandbagging of the trial courts, but rather, to address gross prosecutorial improprieties that have deprived a criminal defendant of his or her right to a fair trial." 21 Am. Jur. 2d *Prosecutorial Misconduct* § 429, at 545 (2008).

Prosecutorial misconduct occurs when the prosecutor engages in conduct that he knew or should have known would deprive the defendant of the right to a fair trial. *Id.* at 544.

*Watts v. State,* 2016 WY 40, ¶ 8, 370 P.3d 104, 107 (Wyo. 2016). The prosecutor's sloppiness or inattention to the discovery matter in this case falls far short of depriving the defendant of the right to a fair trial.

[¶56] The district court considered, at two pretrial hearings, Mr. Black's claim that the State had not complied with the discovery order. The district court made findings and exercised its discretion by making a ruling and fashioning a remedy.

[¶57] We review rulings on pretrial motions for an abuse of discretion. The "abuse of discretion" standard of review requires this Court to consider the reasonableness of the district court's ruling. *Ortiz v. State,* 2014 WY 60, ¶ 92, 326 P.3d 883, 901 (Wyo. 2014); *Schreibvogel v. State,* 2010 WY 45, ¶ 12, 228 P.3d 874, 880 (Wyo. 2010). "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Lancaster v. State,* 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo. 2002) (citing *Trujillo v. State,* 2 P.3d 567, 571 (Wyo. 2000)).

[¶58] We previously applied the abuse of discretion standard to review a district court's denial of a defendant's motion in a circumstance analogous to this one. In *Willoughby v. State,* 2011 WY 92, 253 P.3d 157 (Wyo. 2011), the Appellant moved for a new trial based on claimed prosecutorial misconduct. This Court did not review the claim of prosecutorial misconduct *de novo,* but instead reviewed the district court's denial of the motion for an abuse of discretion. In *Yellowbear v. State,* 2008 WY 4, 174 P.3d 1270 (Wyo. 2008), the Appellant asserted prosecutorial misconduct in closing argument and moved for a mistrial/new trial. The district court conducted a hearing on the motion and denied the request for a new trial. In his appeal to this Court, Yellowbear simply claimed the prosecutor had committed misconduct in the closing argument. We noted

that the district court had already heard and ruled on Yellowbear's claim, and stated "[c]onsequently, what we are really doing here is reviewing the denial of the motion for mistrial and the denial of the motion for a new trial." *Yellowbear,* ¶ 65, 174 P.3d at 1295. The Court then reviewed the district court's decision for an abuse of discretion. *Id.* Mr. Black's appeal presents the same situation. Although he labels his claim to us as one of prosecutorial misconduct, the district court already considered and ruled on that claim. We should only review the district court's decision for an abuse of discretion. The law and the facts demonstrate that the district court did not abuse its discretion on the discovery order issue.

[¶59] Wyoming Rule of Criminal Procedure 16(d)(1) permits a district court to make appropriate discovery orders, and W.R.Cr.P. 16(d)(2) addresses failure to comply with discovery. We adopted the federal standard for determining the appropriateness of a sanction for the State's violation of its discovery obligations and said:

> The district court's decision regarding sanctions for discovery violations is subject to review for abuse of discretion. We agree with the federal precedent interpreting Rule 16(d)(2), which provides three factors for the court to consider in determining the appropriateness of a sanction: (1) the reasons the State delayed producing the requested materials, including whether or not the prosecutor acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance. Once those factors are weighed, the district court should impose the least severe sanction which will ensure the State's compliance with its discovery responsibilities.

*State v. Naple,* 2006 WY 125, ¶ 24, 143 P.3d 358, 365-66 (Wyo. 2006) (internal citations omitted). *See also Toth v. State,* 2015 WY 86A, ¶¶ 24-28, 353 P.3d 696 (Wyo. 2015) and *Salinas v. State,* 2016 WY 97, ¶¶ 18-20, 380 P.3d 647, 650 (Wyo. 2016). Furthermore, in *Naple* this Court recognized that "a continuance may normally be the most desirable

remedy for the government's failure to comply with a discovery order." *Id.*

[¶60] The district court carefully analyzed the evidence presented, and the circumstances of the case, when considering Mr. Black's motion. It thoroughly analyzed the factors set out in *Naple.* In ruling on Mr. Black's complaint about discovery, the district court made findings and conclusions summarized as follows:

1. Initially, the district court ordered the State to provide information from Facebook and Verizon Wireless "on the basis that the motion was unopposed by the State." The State did not directly contact either Verizon or Facebook.

2. No further evidence would have been available from either Verizon or Facebook even if the State had directly contacted those entities. The State provided extractions directly from the victim's phone showing all undeleted data, and "complied with the spirit of the Court's Order, if not the letter of it."

3. The extent of prejudice to Mr. Black from the State's failure to directly contact Verizon and Facebook is not overly significant.

4. Mr. Black's discovery request was based on (a) a desire for information useful in impeachment of the victim, and (b) the possibility of alternative suspect evidence. Mr. Black could adequately impeach the victim without any additional information directly from Verizon or Facebook, and the request for alternative suspect evidence was entirely speculative, "akin to a fishing expedition."

5. The "lack of [the ordered] discovery can be cured by providing an opportunity for a continuance."

The district court then ruled that "to the extent the Defendant would like to seek the discovery information directly, the Court will entertain a motion for a continuance and would prioritize this matter for an expedited trial setting."

[¶61] It was reasonable for the district court to make these findings and offer a continuance. To determine whether the district court acted reasonably, it is necessary to consider some facts beyond those recited in the majority opinion. These facts were available to the district court when it ruled on Mr. Black's motion seeking discovery sanctions.

[¶62] The victim sent and received numerous text messages during the evening of October 26, 2014, up to 9:29 p.m. This incident occurred later that night. Even later on October 26, 2014 and early in the morning on October 27, 2014, the victim took photos and videos showing her injuries and sent them with text messages to the defendant and a friend. The victim was hospitalized the morning of October 27, 2014 and law enforcement interviewed her in the hospital later that day. The victim utilized her text messages and cell phone photos to jog her memory when telling law enforcement what had happened. The victim also gave her cell phone to law enforcement on October 27, 2014. Law enforcement officers extracted all the information from that cell phone on October 28, 2014, and the report from that extraction was provided to Mr. Black's attorney. The extraction report showed 314 calendar items with 63 being deleted, 325 calls in a call log, 48 chats with 12 being deleted, 6,288 contacts with 158 deleted, 1,429 locations with 167 deleted, 5 mms messages, 225 sms messages with 8 deleted, 54 voice mails and 4,013 images. The report did not indicate any deletions of images.

[¶63] More than eight months later, on July 8, 2015, Mr. Black's attorney, for the first time, asked the court to compel the State to obtain records from the victim's cell phone provider and from her Facebook account. In that motion, defense counsel acknowledged that the defense could obtain the information on its own, but asserted that she "believed that it is much easier and more convenient for the State to obtain these requested records than the Defendant." The State did not oppose the motion and agreed to request the information from Facebook and Verizon. The district court then ordered that the State "exercise due diligence to obtain the requested information and shall promptly request the information from Facebook and Verizon."

[¶64] In response, the prosecutor used the victim's Verizon account information to access her Verizon account online. He found no text messages at all remaining in the victim's account, and learned from a conversation with an FBI agent that Verizon does not retain text messages beyond ninety days. The prosecutor also learned that Facebook will retain deleted information only if law enforcement first files a "preservation request" and, even then, the information is retained for only ninety days. Any information that may have been deleted from Facebook before law enforcement filed the preservation request is simply unavailable.[12] The prosecutor did not make any direct requests to Facebook or Verizon.

[¶65] Defense counsel told the district court that the information from Verizon was potentially useful in cross examining the victim about her description of events on October 26, 2014 and might show the existence of some suspect other than Mr. Black. Defense counsel claimed the Facebook information was important because "maybe Mr. Dugan [her investigator] has missed something" when he reviewed the victim's public Facebook page, and because another potential witness had expressed concerns about Mr. Black based on something she had seen on Facebook.

[¶66] From these facts the district court very reasonably concluded that although the State had not contacted Verizon and Facebook directly, it had complied with the spirit of the discovery order. The purpose of the discovery order was to determine whether Facebook or Verizon still had information from the victim's account. The State learned, from the FBI, that no such information was available. The district court reasonably concluded, based on uncontroverted evidence, that contacting Verizon and Facebook would not produce any additional evidence. It reasonably concluded that there was not any substantial prejudice to Mr. Black, and accurately described Mr. Black's claims as a

"fishing expedition." Nevertheless, the district court offered Mr. Black a continuance, which he declined. Without question, the district court did not abuse its discretion.

[¶67] Mr. Black could have accepted a short continuance of the trial and learned directly from Verizon and Facebook what, if any, data still remained from the victim's accounts. Mr. Black chose not to do so, perhaps because it was obvious that the requested information had little bearing on his case, and because it did not exist. Whatever his reason, by declining the continuance, Mr. Black waived any objections he had to the district court's ruling.

**Prosecutor's Closing Statements**

[¶68] I agree with the majority opinion's conclusion that the prosecutor improperly vouched for law enforcement and interjected his personal opinion in his closing argument. Those statements were significant departures from well-established standards of conduct for prosecutors. It may be appropriate for the prosecutor to face consequences for his violation of those standards. However, as discussed below, I do not believe those statements, or the statements discussed below, prejudiced Mr. Black under the strong precedent we have defining prejudice.

[¶69] I do not agree that the prosecutor's characterizations of defense counsel's closing were personal attacks on defense counsel, or that they went beyond statements we found were not misconduct in *Hamilton v. State*, 2017 WY 72, ¶ 14, 396 P.3d 1009, 1014 (Wyo. 2017). There we concluded that the prosecutor's statements only offered the prosecutor's view of the validity of certain defense claims. The same is true in this case. For example, in closing defense counsel referred to photographic exhibits showing blood in various locations around the victim's apartment, and said "does it look like someone's been thrown up against an object and beaten or does it look like someone whose (sic) drunk, high,

---

12. Facebook's written policy, submitted to the district court by Mr. Black, confirms that Facebook would "preserve account records in connection with official criminal investigations for 90 days pending our receipt of formal legal process." Preservation of the records, however, does not result in the records being provided. The policy specifies that "a search warrant issued ... upon a showing of probable cause is required to compel disclosure of the stored contents of any account, which may include messages, photos, videos, wall posts, and location information."

and taking prescription pills that's ping-ponging around a room for several hours letting a cut above her eye bleed all over everything?" During rebuttal, the prosecutor responded "ping-ponging around the room? That's offensive, that took my breath away as well. The implication that Kelli is bouncing around the room like a ping-pong ball smashing her face up against parts of the room, that's crazy." Certainly, counsel should have chosen his words more carefully, but in context his statements were not personal attacks on defense counsel.

### Asch Hearing

[¶70] I agree with the majority's conclusion that the district court failed to comply with the requirements of Asch v. State, 2003 WY 18, 62 P.3d 945 (Wyo. 2003). Asch requires that for a defendant to be restrained during trial, (1) the State must first move to require restraint; (2) the district court must hold a hearing where the defendant can contest the motion; (3) the State must prove the need for restraints and show that it proposes the least restrictive but effective restraint; and (4) the district court must consider a list of factors and then make findings on the record. Id., ¶ 62, 62 P.3d at 964. None of those things happened here. Furthermore, it is troubling that the district court announced it would engage in an independent investigation and ex-parte communication with the sheriff's office to determine whether the defendant should be restrained during trial. Such investigation and ex-parte communications are prohibited by Wyoming Code of Judicial Conduct 2.9 (A) and (C).

[¶71] Failure to comply with Asch requires a harmless error review. Duke v. State, 2004 WY 120, ¶ 29, 99 P.3d 928, 941 (Wyo. 2004); Daniel v. State, 2003 WY 132, ¶ 15, 78 P.3d 205, 212 (Wyo. 2003). Violation of Asch is harmless if, beyond a reasonable doubt, "overwhelming evidence of the accused's guilt exists," or the jury did not see the restraints. I conclude that the Asch violations here were harmless on each of these bases. (Discussion about the evidence against Mr. Black is in a separate section below).

[¶72] Law enforcement required Mr. Black to wear a brace on his knee, under his pants.

The brace automatically locked if Mr. Black stood up. The brace was not visible unless Mr. Black did not pull his pant leg down when he stood up. The district court observed that 'many people have big knee braces. This observation implies the obvious—a knee brace is not seen as a restraint used by law enforcement. The State represented that the knee brace was used "to ensure that the jury doesn't know" (the defendant was restrained). Even if a juror had seen a portion of the brace, or seen Mr. Black walking stiff-legged or with a limp, they would not have seen Mr. Black in a law enforcement restraint. They would have only seen someone who, for an unknown reason, wore a knee brace.

[¶73] Restrictions on courtroom restraint of defendants are based primarily on "the substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear prison garb, is handcuffed or is otherwise shackled." Asch, ¶ 57, 62 P.3d at 963, quoting Holbrook v. Flynn, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). An accused should not be singled out "as a particularly dangerous or guilty person." Id. The knee brace worn by Mr. Black during his trial could not have singled him out as dangerous or guilty, because it was not obvious as a law enforcement restraint. The "restraint" in this case was, beyond a reasonable doubt, harmless.

### Cumulative Error and Prejudice

[¶74] Cumulative error requires reversal only if the combined effect of individually harmless errors becomes harmful. Guy v. State, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008). "An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play." Overson v. State, 2017 WY 4, ¶ 38, 386 P.3d 1149, 1157 (Wyo. 2017). Mr. Black has not demonstrated that the verdict might have been more favorable if

the things he complains of had not occurred. To the contrary, the claimed errors had little effect on the trial, and did not render it unfair.

### Discovery Issue

[¶75] As discussed above, no error occurred when the district court denied Mr. Black's motion for sanctions related to discovery and offered Mr. Black a continuance. Mr. Black waived any complaint he may have had about discovery when he declined the continuance. Consequently, the discovery issue cannot be a basis for considering cumulative error.

[¶76] Even if we consider the prosecutor's failure to directly contact Verizon and Facebook as error, there is no possibility that such failure affected the outcome of the trial in any way. The unrefuted evidence showed that a request for Verizon and Facebook records, ordered in August 2015, would have produced nothing. Any deletions of text messages had to have occurred before October 27, 2014, when law enforcement obtained the victim's cell phone. The victim acknowledged that she deleted posts on Facebook about Mr. Black, but those deletions may have occurred long before August 2015. Because Verizon and Facebook only retain data for ninety days, any request more than 270 days later would have been fruitless. The State accessed the victim's phone account in August 2015, and confirmed that there was no data remaining. Furthermore, Mr. Black was provided with all the photos and text messages extracted from the victim's cell phone on October 28, 2014. The report from that extraction showed no photos had been deleted. Although the extraction report showed some texts had been deleted from the victim's cell phone, those deletions apparently occurred sometime prior to this incident. The only evidence regarding potential phone deletions related to this incident occurred when the victim told defense counsel that she had given her phone to law enforcement on October 27, 2014. Defense counsel then asked "and you didn't of course go in and change any of the timelines or date stamps on anything in your phone?" The victim responded "no."

### Closing Statements

[¶77] The prosecutor's statements in closing were improper, but the evidence against Mr. Black was so substantial that they would not have affected the verdict. The victim unequivocally identified Mr. Black as having beaten her. She testified that during the fight, Mr. Black grabbed her and threw her up against the wall, hitting her head and that at some point, she was on the ground with Mr. Black "whaling" on her, yelling at her, and calling her names. The victim then sent text messages to friends and to Mr. Black containing photographs of her bruised and bloody face with eyes swollen shut, identifying Mr. Black as the assailant. One of the message recipients confirmed she had received the messages, and the photos were entered into evidence. The next morning the condition of the victim's residence was consistent with an altercation having occurred. Mr. Black was found in the residence with the severely beaten victim, and had not sought medical assistance for her. The first person on the scene, Jake Nichols, testified that when he found the victim and Appellant in the residence he "asked them what's going on, what happened," and they "both replied that they had – it was just a little fit, that it was nothing." Doctors testified to the victim's injuries, explaining to the jury that the victim suffered nasal bone fractures, two orbital fractures, injured sinuses, a basilar skull fracture and brain hemorrhaging. The emergency room doctor stated that the extensive injuries were most consistent with an assault. The jury heard testimony that the clothes Mr. Black was wearing when he was arrested (jeans and a t-shirt) tested positive for blood that matched the victim's. The jury saw photographs of Mr. Black's hands taken days after the assault which showed bruising and swelling on his knuckles, consistent with having severely beaten the victim.

### Asch Issue

[¶78] Because the knee brace on Mr. Black during trial could not be recognized as a law enforcement restraint, there is no possibility that this issue had any effect on the verdict.

[¶79] I conclude that there was not cumulative error in this case requiring a remand. Furthermore, I question the status of this case upon remand. The majority concludes that the district court abused its discretion by fashioning a sanction for the discovery problem without a deterrent or punishment effect, but does not specifically state that the district court should have granted Mr. Black's motion to preclude the victim from testifying. It is apparent that any inquiry directed to Verizon and Facebook will produce nothing. A retrial without the victim's testimony obviously would be futile. Although such a sanction may have some impact on the prosecutor, it would impact the victim and the public far more. It makes no sense to retry Mr. Black with the addition of a jury instruction on spoliation of evidence, because such an instruction is appropriate in civil cases, not criminal cases. *See Abraham v. Great Western Energy LLC,* 2004 WY 145, 101 P.3d 446 (Wyo. 2004). Although Mr. Black's trial counsel proposed such an instruction, she withdrew that proposal at the end of the evidence. As discussed above, a retrial which only changes the prosecutor's objectional statements in closing, and even with an entirely unrestrained defendant, would result only in the same verdict. Other sanctions, not involving a reversal and remand, are available to appropriately deter sloppy discovery practice. Such sanctions include filing a complaint with the Board of Professional Responsibility.

[¶80] I understand and fully sympathize with the majority's frustration that the prosecutor did not directly contact Verizon or Facebook after he had been ordered to do so. I share the majority's frustration that this prosecutor made questionable statements in closing. Nevertheless, each case must be examined on its own merits. In this case, I would find that the district court properly exercised its discretion, that the discovery issue had no effect on Mr. Black's right to a fair trial, and any errors were of no consequence on the verdict. I would affirm the conviction.